# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs November 15, 2011 at Knoxville

## STATE OF TENNESSEE v. BRUCE D. MENDENHALL

**Appeal from the Criminal Court for Davidson County**
**No. 2008-C-2541     Steve R. Dozier, Judge**

---

**No. M2010-01381-CCA-R3-CD - Filed January 30, 2013**

---

Following a jury trial, the Defendant, Bruce D. Mendenhall, was convicted of three counts and acquitted of two counts of solicitation to commit first degree murder, a Class B felony. See Tenn. Code Ann. §§ 39-12-102, -12-107, -13-202. The trial court sentenced the Defendant to ten years for each conviction and ordered that the sentences be served consecutively, for a total effective sentence of thirty years. In this appeal as of right, the Defendant contends the following: (1) that the trial court erred by denying his motion to sever two of the counts; (2) that the trial court erred by denying his motion to suppress his statements to the police; (3) that the trial court erred by denying his motion to suppress his statements made to a fellow inmate turned police informant; (4) that the trial court erred by denying his motion to suppress numerous letters the Defendant had sent from jail; (5) that the trial court erred by admitting redacted portions from numerous letters the Defendant had sent from jail and from several telephone conversations the Defendant had while in jail; (6) that the trial court erred by admitting evidence of another crime as "contextual background evidence;" (7) that the evidence was insufficient to sustain the Defendant's convictions; and (8) that the trial court erred by imposing consecutive sentences.[1] Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and CAMILLE R. MCMULLEN, JJ., joined.

C. Dawn Deaner, District Public Defender (at trial); Jason Gichner (at trial), Jeffrey A. DeVasher (on appeal), and Melissa Harrison (on appeal), Assistant Public Defenders, for the appellant, Bruce D. Mendenhall.

---

[1]For the purposes of clarity and brevity, we have renumbered and reordered the issues as stated by the Defendant in his brief.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; Pamela Sue Anderson and Rachael Marie Sobrero, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

FACTUAL BACKGROUND

In 2007, the Defendant was arrested and charged with the murder of Sara Hulbert. Sergeant Pat Postiglione and Detective Lee Freeman of the Metropolitan Nashville Police Department (MNPD) led the murder investigation. Shortly after his arrest, the Defendant gave a statement alleging that he had nothing to do with Ms. Hulbert's murder and that three other individuals were responsible for killing Ms. Hulbert: Lori Young, Ritchie Kiem, and David Powell. However, the police were unable to find any evidence connecting these individuals to Ms. Hulbert's murder. While awaiting trial for the murder of Ms. Hulbert, the Defendant was housed at the Davidson County Sheriff's Department's (DCSD) Criminal Justice Center (CJC) in Nashville, Tennessee. On August 15, 2008, the Defendant was indicted for soliciting a fellow inmate, Roy Lukas McLaughlin, to commit the premeditated first degree murders of Ms. Young, Mr. Kiem, and Mr. Powell. The Defendant was also indicted for soliciting another fellow inmate, Michael Jenkins, to commit the premeditated first degree murders of Sgt. Postiglione and Det. Freeman. A jury trial on the charges was held from January 11 to January 15, 2010.

*I. The Sara Hulbert Murder Investigation and the Defendant's Arrest*

At trial, Det. Freeman testified that he was called to the scene of Ms. Hulbert's murder in the early morning hours of June 26, 2007. Det. Freeman arrived at the TravelCenters of America (TA) truck stop on North First Street around 2:00 a.m. Ms. Hulbert's body was found "in a grassy area at the northeast corner of the parking lot . . . near a fence in [the] back corner." Ms. Hulbert was killed by a "gunshot wound to the head." As part of their investigation, Sgt. Postiglione and Det. Freeman reviewed surveillance video from the TA for the night of the murder. The video showed a yellow semi-tractor "that went back to [the] back area where the body was found." Det. Freeman testified that the yellow truck was "the only one during that time frame that didn't go get gas or . . . you didn't see a driver walk back to the business or anything else."

On July 12, 2007, Det. Freeman went to the TA to review "fuel tickets" from the day of Ms. Hulbert's murder. Sgt. Postiglione was on his way to join Det. Freeman at the TA when he saw a yellow tractor-trailer that "looked similar to . . . the tractor that [he] observed

on the [surveillance] video." Sgt. Postiglione testified that "there were a couple of artistic-type designs on the truck that appeared to be similar to the ones on the video." Sgt. Postiglione followed the truck in his unmarked vehicle without activating any emergency lights or sirens. The truck pulled into the TA parking lot and "went to the same side where [Ms. Hulbert's] body was found." Sgt. Postiglione testified that he parked to the left of the tractor-trailer. Sgt. Postiglione radioed Det. Freeman to let him know that he had spotted a truck similar to the one from the surveillance video and that he was "going to approach the vehicle and speak to the driver."

Sgt. Postiglione testified that he approached the driver's side of the truck and noticed that "the curtains were pulled closed on the driver's side" and that the engine was running. Sgt. Postiglione knocked on the door and "waited for a response" but got none. Sgt. Postiglione knocked a second time, and the Defendant opened the curtains. Sgt. Postiglione testified that he showed the Defendant his identification and "asked" and "motioned" for the Defendant to step out of the truck and speak to him. According to Sgt. Postiglione, the Defendant agreed, "he opened the door[,] and he jumped down." At some point, Sgt. Postiglione asked the Defendant for his identification, and the Defendant gave Sgt. Postiglione his driver's license. Sgt. Postiglione also asked the Defendant "if he had been to Nashville before," and the Defendant stated that the last time he had been in Nashville was May 2007. Sgt. Postiglione testified that as he spoke to the Defendant he noticed "what appeared to be several small drops . . . [of] blood" on the interior of the driver's side door. However, Sgt. Postiglione could not recall exactly when he noticed the spots on the door of the truck.

While Sgt. Postiglione was speaking with the Defendant, Det. Freeman arrived and approached the two. Sgt. Postiglione asked the Defendant if he would consent to give a DNA sample. The Defendant agreed, and Det. Freeman obtained a consent form from his vehicle. Det. Freeman reviewed the form with the Defendant, had the defendant sign the form, and took the DNA samples. Sgt. Postiglione then asked the Defendant if he could look inside the Defendant's truck. The Defendant asked if Sgt. Postiglione "was going to tear his truck up." Sgt. Postiglione told the Defendant that he would not, and the Defendant "said go ahead." Det. Freeman retrieved a consent to search form from his vehicle, and the Defendant signed the form. Prior to entering the truck, Sgt. Postiglione asked the Defendant "if there were any firearms in the vehicle, [and the Defendant] said there [were] not."

Sgt. Postiglione testified that once inside the driver's compartment of the tractor-trailer, he noticed "a black knife" and "a roll of black electrical tape." Sgt. Postiglione then went "into the rear compartment, the sleeper compartment, and sat down on the bed." Once on the bed, Sgt. Postiglione noticed a bag with "some blood" on it behind the driver's seat. Sgt. Postiglione testified that he asked the Defendant "if he could explain the blood inside

the truck," and the Defendant told Sgt. Postiglione that "he cut his leg getting in and out of the truck and that's how the blood got in the back." Sgt. Postiglione asked the Defendant to show him the cut. The Defendant "pulled up his pant leg," but "there was no cut, no scab, no scar there to be seen." Sgt. Postiglione testified that he then asked the Defendant "if this is the truck [they had] been looking for" and that the Defendant "shrugged his shoulders." Sgt. Postiglione asked the question again, and the Defendant answered, "if you say it is." Sgt. Postiglione "followed that up" by asking if the Defendant was "the person [they had] been looking for." The Defendant "shrugged again for a third time and said, 'If you say so.'" Sgt. Postiglione then asked the Defendant again if there was a weapon in the truck, and the Defendant told Sgt. Postiglione that there was a .22 rifle in the truck. The rifle was later found in the sleeper compartment beneath the bed frame.

After the Defendant told Sgt. Postiglione that he had a rifle in the truck, Det. Freeman placed the Defendant under arrest, and the Defendant's truck was impounded to be searched. Det. Freeman left to get a search warrant for the tractor-trailer. Sgt. Postiglione waited with the Defendant "for a patrol unit to come and transport" the Defendant to the precinct. Sgt. Postiglione testified that "it was a very hot day" and that the Defendant "said he was tired and it was hot, he was a diabetic." Sgt. Postiglione asked the Defendant if he wanted to sit in the passenger seat of his car with the air conditioning running, and the Defendant "accepted." Sgt. Postiglione testified that his car was not like a patrol car. Sgt. Postiglione testified that his car was "a very average car."

The Defendant began talking to Sgt. Postiglione while the two waited in the car. The Defendant said that he was "pissed off at Ritchie and David, they did the killing" and then pointed to "[e]xactly" where Ms. Hulbert's body was found. The Defendant told Sgt. Postiglione that Ritchie and David "had sex with the victim" before they killed her. According to Sgt. Postiglione, the Defendant claimed that he "displayed" Ms. Hulbert's body "in the parking lot so somebody would find her and solve the case." Sgt. Postiglione asked the Defendant if he would be willing to give a formal statement at the police station, and the Defendant agreed. When the patrol unit arrived, the Defendant was taken "to the hospital to be checked out to make sure he was medically okay." A short time later, the Defendant was released from the hospital and taken to the police station where he again agreed to give a formal statement.

Sgt. Postiglione testified that he advised the Defendant of his rights pursuant to Miranda v. Arizona, 384 U.S. 436 (1966), and that the Defendant waived his rights and agreed to speak to the detectives. A redacted video recording of the Defendant's statement was played for the jury at trial. In his statement, the Defendant claimed that he was at a Pilot truck stop in Nashville when he was approached by David Powell and Ritchie Kiem. The Defendant claimed that one of the men got in his truck and the other followed him to the TA.

The Defendant explained in his statement that he left his truck to buy a sandwich at the TA, and that when he returned to the truck, he found Ms. Hulbert's naked body "sprawled out in the back." The Defendant stated that the victim had a plastic bag taped over her head with black "electrician's tape." The Defendant claimed that Mr. Powell and Mr. Kiem took Ms. Hulbert's clothes and personal "affects," told him that it was his problem and not theirs, and left. The Defendant told the detectives that he then "proceeded to clean the mess up" and that he "dumped" the victim's body "out in plain view." The Defendant described in detail how he positioned the victim's body in the TA parking lot.

The Defendant claimed that Mr. Kiem and Mr. Powell had sex with the victim before they killed her because "[t]hey were laughing about it." The Defendant denied that he had sex with the victim or that any of his DNA would be found on the victim's body. The Defendant also told the detectives that he thought Mr. Kiem and Mr. Powell used his rifle "since they've did [sic] it before" and because he did not see either of them with a weapon before he left his truck. The Defendant went on to claim that Mr. Kiem and Mr. Powell did "it all the time" and that he did not know how they knew where he was, but that they met him wherever he went. When asked how he knew Mr. Kiem and Mr. Powell, the Defendant explained that Mr. Kiem's mother, Lori Young, rented a home from him "until [he] found out she was a whore. And [he] spent a year trying to get her out of [his] house and couldn't do it until she beat on [his] daughter, [fifteen]-year-old daughter."

Sgt. Postiglione testified that prior to speaking with the Defendant, he had never heard of Mr. Kiem or Mr. Powell. Sgt. Postiglione was able to locate the three individuals the Defendant claimed were responsible for Mr. Hulbert's murder. Ms. Young and her son, Mr. Kiem, were found living in Kentucky, and Mr. Powell was located in Indiana. Sgt. Postiglione testified that during the course of the investigation into Ms. Hulbert's murder, he was unable to find "any shred of evidence . . . whatsoever" connecting Ms. Young, Mr. Kiem, or Mr. Powell to the killing of Ms. Hulbert.

*II. Solicitation of Roy Lucas McLaughlin*

In April 2008, Sgt. Postiglione and Det. Freeman received a letter from Roy Lucas McLaughlin. Mr. McLaughlin was an inmate housed in the same area of the CJC as the Defendant. Based upon information contained in the letter, Sgt. Postiglione and Det. Freeman interviewed Mr. McLaughlin on April 28, 2008. Det. Freeman testified that at this meeting, he and Sgt. Postiglione learned that the Defendant had solicited Mr. McLaughlin to kill Ms. Young, Mr. Kiem, and Mr. Powell.

## A. Mr. McLaughlin's Initial Conversations with Defendant

Mr. McLaughlin testified that he met the Defendant around April 2, 2008, when he was moved to the fifth floor of the CJC. Mr. McLaughlin told the jury that while he was incarcerated, he was known as "C-4" because of his "charges." Mr. McLaughlin claimed that he got to know the Defendant after he prevented an attack on the Defendant by several other inmates. After the incident, the Defendant was referred to as "C-truck" by the other inmates because Mr. McLaughlin had protected the Defendant. Shortly after that, Mr. McLaughlin received a letter from the Defendant that was signed "C-truck" and that stated, "We all need friends, I would enjoy being able to call you a friend, talk to you on the roof." Mr. McLaughlin explained that the inmates were taken to the roof for outdoor recreation time when the weather permitted.

Mr. McLaughlin testified that he played chess with the Defendant and talked to the Defendant about trucking, fishing, and other "general talk." Mr. McLaughlin explained that the inmates could talk to each other through the air vents. Each inmate also received one hour outside of his cell to "make phone calls, get a shower," and do whatever the inmate needed to do. During that hour an inmate could talk to the other inmates in his cell block by going up to their cell doors. Mr. McLaughlin stated that he had "quite a few chances" to talk to the Defendant while they were on the fifth floor. Mr. McLaughlin testified that he and the Defendant talked about their charges and that the Defendant eventually asked him if he had ever "blown anything up." The Defendant then asked Mr. McLaughlin if he "knew any truckers that might . . . be willing to help him out with an alibi." Mr. McLaughlin testified that he talked "extensively" with the Defendant about finding the Defendant an alibi.

Mr. McLaughlin testified that he eventually asked the Defendant why he needed an alibi so badly. According to Mr. McLaughlin, the Defendant told him that Ms. Young "was trying to frame him [and] planting evidence." Mr. McLaughlin recalled that at some point, the Defendant sent him a letter asking what his "charges" were and if he had been involved in killing another inmate's brother in an explosion. Mr. McLaughlin testified that the Defendant eventually asked him "[h]ow much C-4 would it take to blow up a trailer." Mr. McLaughlin laughed and told the Defendant "not much." Mr. McLaughlin testified that they did not talk about it anymore that day, but the next day when they were on the roof the Defendant told Mr. McLaughlin that Ms. Young, Mr. Kiem, and Mr. Powell were attempting to frame him for Ms. Hulbert's murder. According to Mr. McLaughlin, the Defendant asked him "what it would take to get rid of them." Mr. McLaughlin testified that he went along with the Defendant because he had a reputation in the jail as a "bomber hit man." Mr. McLaughlin further testified that he and the Defendant talked about killing Ms. Young the same way Ms. Hulbert had been killed to "draw attention away from that." The two also talked about blowing up Mr. Kiem and Mr. Powell's truck.

Mr. McLaughlin testified that he recalled having three or four conversations with the Defendant about killing Ms. Young, Mr. Kiem, and Mr. Powell before he contacted the police. Mr. McLaughlin further testified that the Defendant told him their names, their addresses, "where they hung out, where they worked, [and] what they drove." According to Mr. McLaughlin, the Defendant gave him information about what Ms. Young and Mr. Powell looked like, but the Defendant told Mr. McLaughlin that he could not remember what Mr. Kiem looked like because "it had been so long since he had seen him." Mr. McLaughlin testified that he could not remember any of the details of what the Defendant had told him, but that he wrote it down at the time. Mr. McLaughlin also claimed that the Defendant wrote him a letter in which the Defendant offered to give him "a truck" in exchange for killing the victims. Mr. McLaughlin testified that he came up with the idea that the Defendant would pay him $15,000 by working it off at his uncle's trucking company. Mr. McLaughlin claimed that the Defendant's letter was taken from his cell by the deputies guarding him.

According to Mr. McLaughlin, he decided to contact the police about his conversations with the Defendant because he "thought [he] was getting set up." Mr. McLaughlin wrote to Sgt. Postiglione and Det. Freeman because the Defendant "had mentioned that they were hounding him pretty hard." Mr. McLaughlin testified that after he sent the letter, he had a "couple" more conversations with the Defendant about killing the victims. According to Mr. McLaughlin, he and the Defendant discussed "the best way to do it," when to kill the victims, and how to make sure "there was no connection between [the Defendant] and [Mr. McLaughlin]." Mr. McLaughlin testified that he wrote some of this information down because he did not have "too good of a memory." Mr. McLaughlin stated that he brought what he had written down to his meeting with Sgt. Postiglione and Det. Freeman on April 28, 2008. At that meeting, Mr. McLaughlin was asked if he would wear a recording device the next time he and the Defendant were sent to the roof for recreation time.

Mr. McLaughlin testified that he told the detectives he would consider wearing a "wire." Mr. McLaughlin explained that he was "nervous" to wear a wire because it was "not too awful good" to be known as a "snitch" inside the jail. However, Mr. McLaughlin met with the detectives again the next day and agreed to wear a recording device the next time he and the Defendant were on the roof. Mr. McLaughlin testified that the police and the district attorney's office did not offer him "anything in exchange" for wearing a wire. Mr. McLaughlin met again with the detectives on May 1, 2012. On that day, Mr. McLaughlin was shown how to work the recording equipment and instructed not to ask the Defendant any questions about the Defendant's "pending case." Instead, the purpose of the wire was to gain information on the Defendant's alleged solicitation of first degree premeditated murder.

*B. May 2, 2008 Wire Recording*

On May 2, 2008, Mr. McLaughlin was scheduled to go to the roof with the Defendant for recreation time. Mr. McLaughlin had a broken wrist at that time, and this was used to explain why Mr. McLaughlin was taken from his cell. A redacted version of the wire recording was played for the jury at trial. In the recording, Mr. McLaughlin complained to the Defendant that a guard had ransacked his cell. Mr. McLaughlin told the Defendant that if he were not incarcerated he would "rig [the guard's] car up man, boom." The Defendant then informed Mr. McLaughlin that his lawyers had informed him that there was "a snitch" in the jail and to keep his "mouth shut."

Mr. McLaughlin told the Defendant that "like [they] were talking about" earlier, he was "trying to think of people [he] already [knew]" to help the Defendant with an alibi. Mr. McLaughlin then asked the Defendant where he needed an alibi witness to say they saw the Defendant. The Defendant responded that he "would need them at the TA [to] say [they] heard [him] tell the q---r [(Sgt. Postiglione)] no to the search, is what [he] need[ed]." Mr. McLaughlin informed the Defendant that he was "still working on that." Mr. McLaughlin then asked the Defendant if "this right here is [Ms. Young's] correct address." The Defendant responded that it was "[f]or now." The following exchange then occurred:

> [Mr. McLaughlin]: What uh, but, here's my thing, I told you, you know, I'd help you -
> [The Defendant]: But yeah.
> [Mr. McLaughlin]: When you get out?
> [The Defendant]: Yeah.
> [Mr. McLaughlin]: I want you to look at me, just don't f--k me over.
> [The Defendant]: I don't f--k people over.
> [Mr. McLaughlin]: I, but we cool, I just, I want to get that up front.
> [The Defendant]: I don't kill people either.
> [Mr. McLaughlin]: Well, yeah, I don't technically kill people, but I mean, my – well, my thing is, look. I'm not going to sit here you know if I - -
> [The Defendant]: I'm just saying.
> [Mr. McLaughlin]: Let me think of how to phrase this.
> [The Defendant]: I would owe you dramatically.
> [Mr. McLaughlin]: Right, well my thing is, [Ms. Young] goes away, you know.
> [The Defendant]: Yeah.
> [Mr. McLaughlin]: My preferred, hell, I'll blow a b---h up, I don't give a f--k. But my thing is, hang on a second . . . . Hell, here's my thing. That right there is eliminated and nobody testifies against you then and you come out [and]

drive a truck? You got to hook up with me because that's how, you know, we'll work it, work it off like that.

[The Defendant]: Nobody else will hire me.

[Mr. McLaughlin]: Look, man this s--t look, you man, you acquitted on s--t like this, man you ain't got to worry about s--t.

[The Defendant]: I'm just saying, nobody else will hire me because that.

[Mr. McLaughlin]: That cloud.

[The Defendant]: Yeah.

Mr. McLaughlin then told the Defendant how he was "planning everything" and assured the Defendant that as long as Ms. Young lived at the address the Defendant had provided him, he would kill her. Mr. McLaughlin asked the Defendant where Ms. Young worked. The Defendant responded that he did not know because Ms. Young was "a hooker." Mr. McLaughlin told the Defendant to get "against the wall" because he did not want "too many people listening." Mr. McLaughlin told the Defendant that "hypothetically" the rumors that Mr. McLaughlin had killed another inmate's brother were true. The following exchange then occurred:

[Mr. McLaughlin]: Alright, hypothetically, you know, I ain't going to admit to s--t well, I mean, I don't give a f--k. I like to know people's patterns. Where they go, where they go shopping, that way s--t looks like [an] accident man. You know, if motherf--kers found, you know, if. Alright. Say you go to the gym at four o'clock everyday when you get off work.

[The Defendant]: Mmm-hmm.

[Mr. McLaughlin]: You know and it's on 100th street, alright, but you are found on 500th street. You are not in your normal area. See what I'm saying?

[The Defendant]: Yeah.

[Mr. McLaughlin]: I want s--t to look like it's, I want the detective to look at s--t when he finds a body and go, well they got robbed, you know. Normal everyday thing, they're going where they go. Alright, that's how I take care of my s--t. You know that's why I ain't been linked up. F--k that s--t.

[The Defendant]: Her normal everyday is Monday through Friday truck stop whore.

[Mr. McLaughlin]: You know what truck stop?

[The Defendant]: Any that she can get to.

[Mr. McLaughlin]: She run a CB?

[The Defendant]: Yeah.

[Mr. McLaughlin]: What's her handle?

[The Defendant]: Uh, Spoiled Brat.

[Mr. McLaughlin]: Spoiled Brat?

[The Defendant]: Yeah.

[Mr. McLaughlin]: So if I can get up on there and you know make spo - -

[The Defendant]: If you hollar [sic] for her it's going to tip her off.

[Mr. McLaughlin]: Well how the f--k?

[The Defendant]: And she'll hide. She's smart. How do you think she got me set up?

[Mr. McLaughlin]: Well how the hell do you think I'm going to, dude, how can I find her then if she don't live there? 'Cause dude, I ain't going to do my s--t like that. Hell, I'll just blow, [does] she live in a trailer?

[The Defendant]: Yeah, trailer park.

[Mr. McLaughlin]: Oh, a trailer park.

Mr. McLaughlin then asked the Defendant what kind of car Ms. Young drove. The Defendant responded that she drove a Dodge or a Plymouth. Mr. McLaughlin asked again if Ms. Young lived in a trailer park, and the Defendant responded, "Yeah, it's a trailer park." The Defendant then told Mr. McLaughlin that Ms. Young was framing him for Ms. Hulbert's murder. The Defendant claimed that he saw Ms. Young "one night when this supposedly person got killed," but that her son, Mr. Kiem, was "alibiing her" and that was what was "f--king" the Defendant. Mr. McLaughlin asked the Defendant for more information about Mr. Kiem. The Defendant told Mr. McLaughlin that Mr. Kiem lived with Ms. Young and that he had "a baby and a girlfriend and she, she hooks too." The two men then engaged in the following exchange:

[Mr. McLaughlin]: Alright, here's the, here's the trip. Let's make it look like a gas leak. I'll blow the whole f--king house up. It's a gas leak.

[The Defendant]: Whatever. You know that's your, that's your thing.

[Mr. McLaughlin]: Yeah, I mean I don't. I'll do what, I, what I'm good at. You just, you know you don't even have to worry about it. After court, after your trial?

[The Defendant]: Yeah.

[Mr. McLaughlin]: We settle up. We do our thing.

[The Defendant]: How, how can we settle up? I, I - -

[Mr. McLaughlin]: You come work. You just pay it, you just pay it off.

[The Defendant]: Okay.

[Mr. McLaughlin]: Alright, you know, like you, like you said you was.
. . .
[Mr. McLaughlin]: Alright, well here's the deal. I'll take care of that little issue, when you come out, you drive a truck and, you know, we'll do like a ten percent or something for a couple of months.

[The Defendant]: Alright.

-10-

[Mr. McLaughlin]: You know, you know how much you can make on a hot load and s--t. Like, if you, if you running streamline, you know, state, state, state?

[The Defendant]: Yeah.

[Mr. McLaughlin]: Twelve, fourteen hundred dollars a week. You know, until I say, I, I get five grand, then you, you kill my ten percent. You ain't got to pay that. Like I said –

[The Defendant]: Whatever you say.

[Mr. McLaughlin]: We're truckers. I got you bro.

Later, Mr. McLaughlin told the Defendant that he "was a hit man" and that he blew "people up." Mr. McLaughlin told the Defendant that he would give him "an update later" after he found "out some more stuff." Mr. McLaughlin asked the Defendant to keep what they had "just talked about" between themselves. The Defendant responded that "[i]t stays." Mr. McLaughlin then asked how the Defendant managed to "piss off" Ms. Young. The Defendant claimed that Ms. Young thought he was "in love with her." Mr. McLaughlin responded that the Defendant would not have "to worry about her. I got her." Mr. McLaughlin then approached another inmate, identified as "L-Hood," and the two proceeded to discuss how Mr. McLaughlin, once he was released from jail, would kill two witnesses for L-Hood. Mr. McLaughlin told L-Hood that he would kill both witnesses for $10,000, "two for one." Mr. McLaughlin described himself to L-Hood as "a psycho motherf--ker [who] blows people up" and upon his release would be "giving out hell." Mr. McLaughlin told L-Hood that he had "earned" his nickname, C-4, and that it would only "take four ounces of C-4" to kill the witnesses. Mr. McLaughlin then went back and continued his conversation with the Defendant until they were returned to their cells.

At trial, Mr. McLaughlin testified that while he was incarcerated "a rumor had been started" that he had killed another inmate's brother. Mr. McLaughlin explained that he "[k]ind of went with it" regarding the rumors that he had killed someone because there was "no way you can get rid of a reputation in jail." Mr. McLaughlin denied telling other inmates that he had previously killed people. Instead, Mr. McLaughlin insisted that when another inmate would ask him if he "could kill witnesses," he would "just let that ride and stay[] with the program so to speak." Mr. McLaughlin testified that he never attempted to challenge the impression that he was a "hit man" because "[t]he less information that you give about yourself in jail, the better." However, Mr. McLaughlin denied that he had lied to his fellow inmates about whether or not he was a killer.

According to Mr. McLaughlin, L-Hood "believed" the rumors about him being a hit man. Mr. McLaughlin claimed to have been surprised by L-Hood's approaching him that day and requesting that he kill two witnesses. However, Mr. McLaughlin later clarified that

-11-

the two had previously discussed the matter "the night before and a couple of days before in the cells." According to Mr. McLaughlin, he was surprised by L-Hood's request because the two had only previously discussed Mr. McLaughlin's providing explosives and building an explosive device for L-Hood. Mr. McLaughlin denied approaching L-Hood and discussing the "hit" so that he "could get some extra help from the detectives."

*C. May 16, 2008 Wire Recording*

Mr. Kiem and Mr. Powell's names were never mentioned in the May 2, 2008 recording. After listening to the recording, Sgt. Postiglione and Det. Freeman decided to have Mr. McLaughlin wear a body wire a second time in order to get "more detail." Det. Freeman testified that given the difficulty of coordinating a wire operation in jail, it would ideally only be attempted once. However, Mr. McLaughlin "was talking too much" on the May 2, 2008 recording. Det. Freeman testified that they wanted Mr. McLaughlin to wear a wire a second time so that it would be clearer who the Defendant wanted killed and how the Defendant would pay Mr. McLaughlin. Det. Freeman explained that on the May 2, 2008 recording, "things were talked about [without using] full names or anything like that." Instead, Mr. McLaughlin and the Defendant's conversation showed that they knew "what each other were talking about" based upon previous conversations, but "somebody listening to it wouldn't understand all of it." Mr. McLaughlin agreed to wear a wire for a second time on May 16, 2008.

A redacted version of the wire recording was played for the jury at trial. After some small talk, Mr. McLaughlin told the Defendant that he was worried about what would happen "[i]f they start correlating this s--t after [he] [got] out." Mr. McLaughlin stated that he did not think that the Defendant would turn him in to the police, but that he wanted to "just go ahead" and "iron everything out." The following exchange then occurred:

[Mr. McLaughlin]: Who, you know, I've done my, my homework. I ain't gonna walk into s--t blind. But, who the hell is David [Powell]? What's, what's his whole connection? I mean, if I'm gonna, if I'm gonna pop his ass, I need to know why. I mean, what did he, who is he to you though?
[The Defendant]: Nobody. He's a friend of uh . . .
[Mr. McLaughlin]: Alright. Whoa, whoa, whoa.
[The Defendant]: . . . Richie [Kiem] and Lori [Young].
[Mr. McLaughlin]: Oh, okay. 'Cause I'm sitting here going, alright, well he's on the list, you know, you know, I'm gonna make his ass go bye bye, I kinda, you need, need . . .

-12-

[The Defendant]: And he, uh, he's living with [Ms. Young's] daughter. Um, 'cause, and her daughter is a hooker too, that goes to the three truck stops up there in Anderson.

[Mr. McLaughlin]: Alright. Well, do you think all them together is really that big of a threat though?

[The Defendant]: Could be.

[Mr. McLaughlin]: Alright. Well, like we discussed, hang on . . .

. . . .

[Mr. McLaughlin]: But uh, sorry, I just don't like talking around people. You know how I am.

[The Defendant]: Yeah.

[Mr. McLaughlin]: But uh, so, they, they could be that big of a threat?

[The Defendant]: Yeah, it's possible.

[Mr. McLaughlin]: Alright. Like we talked in my cell the other day, as far as uh, uh, what's her name? Um, [Ms. Young] and that little ordeal with her pick-up truck?

[The Defendant]: Um-hmm?

[Mr. McLaughlin]: I thought about it, and I'm just gonna do it how I'm gonna do it. It's a gas leak in the trailer, and everybody blows up. I'm happy. You're happy. And my part's done with it. Uh, you know, my thing, I was, I wanted to, you know, I got the [Ms. Young] thing down, I just wanted to know who the [Mr. Powell] guy was and if, if he was that big of a threat, that you know, one thing I don't like doing is innocent bystanders.

[The Defendant]: Um-hmm.

[Mr. McLaughlin]: I don't, I don't want to kill an innocent bystander. You know. But, like you said, if they that big of a threat, f--k it. What's one more explosion?

[The Defendant]: Yep.

[Mr. McLaughlin]: Oh, me. Oh, so.

The Defendant then told Mr. McLaughlin about a "hawk" he saw on the roof "the other day." After discussing the hawk, Mr. McLaughlin went on to clarify how the Defendant would pay him for the murders. The following exchange occurred:

[Mr. McLaughlin]: Seeing as how the truck thing is kinda wishy-washy, we still, we still on for what we discussed about, you know, I was just fixing to say . . . . But um, we still on, and you pay me back? You know . . .

[The Defendant]: Yep.

[Mr. McLaughlin]: . . . Later. Alright. Now as far as a price now, I don't want you to, you know, or a fee, how about that? I'm thinking like roughly fifteen,

fifteen thousand. And that's for the whole thing, everybody. And you go about your merry day. No witnesses show up for you. But, I mean, I ain't gonna [be] coming up here visiting you or nothing. "Hey boo, took care of that s--t."

[The Defendant]: Ah, naw.

[Mr. McLaughlin]: I'll send, I'll send ya a big old billboard, how about that.

[The Defendant]: No connections.

[Mr. McLaughlin]: Yeah. That's, that's my thing, I don't want no connections.

[The Defendant]: Just the number to your uncle's trucking company.

[Mr. McLaughlin]: Alright. And you, you still need those alibis right?

[The Defendant]: Um-hmm.

[Mr. McLaughlin]: Alright. I got them set up for you. So, I got that information you wrote me down.

[The Defendant]: Um-hmm.

[Mr. McLaughlin]: Where they were supposed to see you and everything.

[The Defendant]: Right.

[Mr. McLaughlin]: So, so that's good. Ah, now, you know I'm not new to this. So, I'm gonna ask you something that I've had to ask a couple of other people. I ain't gonna do this, then you gonna wind up having remorse, or a guilty conscience or whatever.

[The Defendant]: Like I said, you do your thing (inaudible).

[Mr. McLaughlin]: Alright.

[The Defendant]: (Inaudible) it's not mine.

[Mr. McLaughlin]: Then I'll do it how I do it. Uh, so.

[The Defendant]: And I don't want to know. You know.

[Mr. McLaughlin]: Ah, plausible deniability with you?

[The Defendant]: Sure. The less I know, the better it is for you.

[Mr. McLaughlin]: How is it less . . . come over here, man.

[The Defendant]: 'Cause if they connected us I could say no, no that's bulls--t.

[Mr. McLaughlin]: Well, I, I, I see what you're saying. Uh, on a serious note, there's, there's, this right here is how it'll backfire. Okay?

[The Defendant]: Um-hmm.

[Mr. McLaughlin]: Ah, they're gonna testify against you, I'm gonna go ahead and kill them, just cut to the chase. You get nervous later on, and you get, I'm just listen to me, alright? You get nervous later on and give me up, there gonna be a world of s--t. That's, that's how shit gets f--ked up.

[The Defendant]: Alright.

[Mr. McLaughlin]: Alright. Um.

[The Defendant]: Like I said, after today, we don't talk at all.

[Mr. McLaughlin]: Well, that's, that's why I want to get all this ironed out.

[The Defendant]: Yeah.

[Mr. McLaughlin]: Because, um, we can't, you know. I mean, walking around up here, yeah. It don't look too bad. Cause well, we're white.

[The Defendant]: Right.

[Mr. McLaughlin]: I mean, you get my point on that one.

[The Defendant]: Yeah.

[Mr. McLaughlin]: Uh, you know, everybody usually sticks to their own up here. But, that's why I want to get all of this ironed out today, you know? 'Cause are they gonna be at separate spots or do they all live together in the house, I mean, you know. If, if I blow up the trailer, and take out [Ms. Young] and her son, I don't know his name.

[The Defendant]: Ritchie [Kiem].

[Mr. McLaughlin]: Oh, [Mr. Kiem], okay. If I go ahead and take them two out, does [Mr. Powell] live there too? Or . . .

[The Defendant]: Nope.

[Mr. McLaughlin]: Okay.

[The Defendant]: He lives in Anderson, Indiana on Drexel Street.

[Mr. McLaughlin]: On Drexel. Okay. Then what I'll do, and you said he's with her daughter.

[The Defendant]: Right.

[Mr. McLaughlin]: Alright. Does she need to go?

[The Defendant]: Not really, no.

[Mr. McLaughlin]: Alright. So she can't hurt you.

[The Defendant]: No.

[Mr. McLaughlin]: So, [the] only one's that's gonna can hurt you by testifying [are] . . . [Ms. Young], [Mr. Powell], and um, . . .

[The Defendant]: Her son.

[Mr. McLaughlin]: . . . that [Mr. Kiem] boy.

[The Defendant]: Yep.

[Mr. McLaughlin]: Alright. Those are the only three that can hurt you.

[The Defendant]: Yep.

[Mr. McLaughlin]: Well, guess what, they ain't gonna hurt you. You know? I, I, thought a little bit. Uh, you know how I sit there and I'll ponder different directions, you know . . .

[The Defendant]: Um-huh.

[Mr. McLaughlin]: . . . look into different options. Uh, I say you're gonna owe me fifteen grand, which is f--king cheap. Uh, I mean, it's f--king . . . you heard rumors flying around here about how much I got paid for doing little dude's brother.

[The Defendant]: No. No. And I don't even want to know.

[Mr. McLaughlin]: Yeah, yeah. Let's not get into my prior cases. I don't need nobody going to the police and being like, "Hey you remember this case, well guess what?" So, I mean, I [doubt] you'll do that. But uh, fifteen grand, I kill all three. After that, you don't know me until you come out, then you just call that phone number, talk to my uncle. My uncle will get you in touch with me. But other than that, we don't know each other.
[The Defendant]: Alright.
[Mr. McLaughlin]: Is that a deal?
[The Defendant]: Yeah.
[Mr. McLaughlin]: Alright. So, everything. I mean, you know, I didn't want to turn your words around, but I mean, based on what all you told me and the conversations we've had . . .
[The Defendant]: Um-hum.
[Mr. McLaughlin]: . . . that's how it stands. We straight?
[The Defendant]: Yep.

Mr. McLaughlin asked the Defendant if there was "anything else [he] need[ed] to look into." The Defendant responded that he had "no idea." Mr. McLaughlin asked again if there was anyone else he had to "worry about," and the Defendant responded that there was no one else as far as he knew. Mr. McLaughlin then asked the Defendant to give him Ms. Young's full name and the type of car she drove. The Defendant provided this information to Mr. McLaughlin. Mr. McLaughlin asked the Defendant that if he saw "a b---h driving a Ford Ranger" pull up to "the trailer," could he "hit it that day," could he "blow [it] up and [] know [he] got the right one." The Defendant responded, "Right." A short time later, the following exchange occurred:

[Mr. McLaughlin]: So, but uh, who's the new guy that you just said? What's
. . . .
[The Defendant]: David Powell?
[Mr. McLaughlin]: No, I've already got [Mr. Powell's]. You already gave me that information. I got it in a . . .
[The Defendant]: Uh, Ritchie [Kiem]?
[Mr. McLaughlin]: Yeah. Alright. How, how old, how old is . . . oh, that's, that's her son?
[The Defendant]: Yeah.
[Mr. McLaughlin]: Well, hold on. Whoa. Is he a minor?
[The Defendant]: The same age as uh, well, hell no.
[Mr. McLaughlin]: Uh, uh, well dude, I just . . .
[The Defendant]: Same age as David Powell.

[Mr. McLaughlin]: I look at it like this man, if you live with your momma, your ass better be under eighteen. You know, 'cause, if you're over eighteen, you outta be out on your damn own. That's just how I look at it.

[The Defendant]: Yah. But, how can you do crime and not have your momma to alibi ya?

[Mr. McLaughlin]: Actually, I guess that's a damn good alibi, cause you know she ain't gonna turn on ya.

[The Defendant]: Yeah.

[Mr. McLaughlin]: So, alright, well, we straight up. Those are the three that die. Fifteen thousand, and you don't know me.

[The Defendant]: I don't know you.

[Mr. McLaughlin]: I like that. I like that.

[The Defendant]: Leave that there number when you get ready to leave.

[Mr. McLaughlin]: Do what?

[The Defendant]: Your uncle's number.

The two men then discussed Mr. McLaughlin's broken wrist for several minutes before Mr. McLaughlin asked the Defendant if "there [was] any particular way" the Defendant "would like for these services to be carried out." The Defendant responded "no," and agreed with Mr. McLaughlin's statement "[j]ust as long as they don't show up for court." Mr. McLaughlin told the Defendant that he was "getting paid to provide a service" and that he "just want[ed] to make sure everybody's happy with it." Mr. McLaughlin told the Defendant to remember "[p]lausible deniability" and that the Defendant did not know Mr. McLaughlin. The Defendant responded that he "just met [Mr. McLaughlin] up here. That's it. Walked around talking trucking."

The two men then spent several minutes discussing other prisoners before the following exchange occurred:

[Mr. McLaughlin]: You let me take care of that. You, you.

[The Defendant]: You know they're not gonna say, "Yeah, yeah, we'll cut you loose."

[Mr. McLaughlin]: Hey, I don't give a s--t. Hey, all I know is you hired my services. Those people ain't gonna show, you going home. If that's your goal? You know, don't worry about.

[The Defendant]: Going home's my goal.

The Defendant then changed the subject and began talking about a beam above them on the recreation area's roof. After discussing how the beam was attached to the building, the two men talked about the weather, a prisoner who had a heart attack, and other various topics.

-17-

A short time later, Mr. McLaughlin told the Defendant "no more talk" and assured the Defendant that he had the victims "taken care of." The Defendant urged Mr. McLaughlin not to forget to give him the phone number for Mr. McLaughlin's uncle because the Defendant did not want Mr. McLaughlin to get out and forget about him. Mr. McLaughlin again assured the Defendant that he would give the Defendant his uncle's phone number and that he would not forget the Defendant. Mr. McLaughlin stated that he would "do what I do" and "kill these three and that's it." Mr. McLaughlin asked the Defendant not to "lay [him] out there," and the Defendant stated that he would not.

At the conclusion of the recreation hour, the two men were placed back in their cells. A short time later, the Defendant was allowed out of his cell for his hour of personal time. As the Defendant walked around the cell block, Mr. McLaughlin asked the Defendant to come to his cell door. Mr. McLaughlin then asked the Defendant for more details about Mr. Powell. The Defendant spelled Mr. Powell's name for Mr. McLaughlin and provided Mr. McLaughlin with Mr. Powell's street address. Mr. McLaughlin asked the Defendant for more information about Mr. Kiem. The Defendant stated that Mr. Kiem lived with Ms. Young, told Mr. McLaughlin how old Mr. Kiem was, and spelled Mr. Kiem's name for Mr. McLaughlin. Mr. McLaughlin asked the Defendant for a description of Mr. Kiem, but the Defendant stated that he had not "seen him in years." However, the Defendant made several disparaging remarks about Mr. Kiem's intelligence and told Mr. McLaughlin that Mr. Kiem went "to school" and was picked up by a "[s]chool bus" for "like [] GED classes." The Defendant also told Mr. McLaughlin what color Mr. Kiem's hair was and that he thought Mr. Kiem had a beard.

Mr. McLaughlin then told the Defendant that he would make Ms. Young's murder "look like a copy cat." Mr. McLaughlin explained that "if it happens the same way" and the Defendant was in jail, then he would have "a damn good alibi." The following exchange then occurred as Mr. McLaughlin further explained his reasoning to the Defendant:

> [Mr. McLaughlin]: That if uh, if I took and made it look like your s--t, then, you know, your lawyers will have something to go on. Like hey, listen, this other s--t happened to another woman at a truck stop. And you know, the same way, and you know, so, and it couldn't have been him, 'cause he was in here. You know, it don't matter whether she was a witness against you or not. You see what I'm saying?
> [The Defendant]: Um-hmm.
> [Mr. McLaughlin]: But if I go, like we talked about while ago. I go to blowing s--t up? 'Cause you know me, I love that s--t. I'll make that s--t be seen from the f--king space, astronauts up there at the U.S. space station go damn, say "What the hell's that?" I mean, 'cause I'm gonna make it go boom, motherf--

-18-

ker.  But, what I would rather do is, if I'm gonna do this for you, I'd rather do her, because she is a female, I'd rather do her at a truck stop like that.  Okay?  And then, I can take, I can take and put a bullet you know, I can take a Barrett fifty cal, two miles away and take care of the other motherf--kers.  You know.  But I was just thinking with her, make it look like the previous s--t.  You know what I mean?

[The Defendant]: Right.

[Mr. McLaughlin]: But, I mean, I wanted to get your approval on that before I done anything.  I didn't want that, 'cause I didn't want you to hear about it and all of a sudden you freak out.  You see, yeah, you're laughing, but you see what I mean.

[The Defendant]: Oh yeah.

[Mr. McLaughlin]: I mean, what would you think if all of a sudden you heard that, you know, that the witness you asked me to take care of, was killed like these you'd flip man.

[The Defendant]: I don't, huh?

[Mr. McLaughlin]: Exactly.  You would have flipped your lid dude.

[The Defendant]: Still will anyway.

[Mr. McLaughlin]: Well, I mean, is that cool?  You want me to, you want me to do it like that?

[The Defendant]: However.

[Mr. McLaughlin]: Alright.  Done.

[The Defendnat]: Okay.

Mr. McLaughlin told the Defendant that he thought the Defendant would be out "in a year" thanks to the fact that the Defendant's "witnesses" would be gone and the alibis he would provide the Defendant.  Mr. McLaughlin told the Defendant that he wanted to make sure they were "copasetic" because he did not want the Defendant to "start freaking out."  The Defendant assured Mr. McLaughlin that he did not "freak out."  Mr. McLaughlin then asked the Defendant if Ms. Young would be carrying a weapon.  The Defendant stated that he had "no clue" but warned Mr. McLaughlin that Ms. Young "changes . . . like a chameleon."  The recording concluded with Mr. McLaughlin and the Defendant playing several games of chess.

In addition to the audio recordings, portions of the conversations were video taped and those videos were shown for the jury.  Sgt. Postiglione testified at trial that they could not record video of the entire conversation because there was a chance the inmates might see the camera and the videographer.  Mr. McLaughlin admitted that while he told the Defendant in both recordings that he would be leaving on May 27, 2008, he knew that was not true.  Mr. McLaughlin was not released until he pled guilty on August 14, 2008.  However, Mr.

McLaughlin was removed from the CJC after the Defendant's attorneys were informed about the body wire recordings. Mr. McLaughlin also admitted that on the May 16, 2008 recording, he was the first person to bring up the topic of killing the victims. Mr. McLaughlin also acknowledged that at times during the recording the Defendant seemed "distracted" and would change the subject. However, Mr. McLaughlin claimed that the Defendant did this "because another inmate was walking by [them]."

### D. Impeachment Evidence Regarding Mr. McLaughlin

Mr. McLaughlin testified that while he was incarcerated with the Defendant, he had charges for four Class B felonies and one Class C felony pending against him. Mr. McLaughlin explained that he had been arrested "for having explosive components, gun powder and stuff of that nature." Mr. McLaughlin was also facing a Class D felony for passing a worthless check. Mr. McLaughlin subsequently pled guilty to one count of possessing a "prohibited weapon" and one count of passing a worthless check. Mr. McLaughlin received eight years on probation as part of his guilty plea. Mr. McLaughlin testified that he was also on probation for a separate conviction of theft. After Mr. McLaughlin was released, a probation violation warrant was filed against him because he failed to report to his probation officer. Mr. McLaughlin's probation was ultimately reinstated. Mr. McLaughlin denied that there was a current probation violation warrant pending against him. Mr. McLaughlin admitted that all together he had four felony convictions and four misdemeanor convictions. Mr. McLaughlin also admitted that he had written "some bad checks in Arkansas" in 2006. Mr. McLaughlin further admitted that he was "moved around" the CJC because he had gotten into fights and had possessed contraband.

On cross-examination, Mr. McLaughlin contradicted his earlier testimony and the information on the wire recordings. Mr. McLaughlin stated that before he met with the detectives, the Defendant had asked about killing Ms. Young "specifically and vaguely about two other people but [he] didn't . . . [have] their names at that time." Mr. McLaughlin also testified on cross-examination that the Defendant only asked him to kill the victims after he told the Defendant that he could not get any alibi witnesses for the Defendant. Mr. McLaughlin testified that he could not remember when he told the Defendant that. However, the May 16, 2008 wire recording clearly belied this statement because Mr. McLaughlin told the Defendant that he had alibis ready for the Defendant.

Mr. McLaughlin denied that his cooperation in this case was a part of the plea deal he received for his pending cases. Mr. McLaughlin admitted that in January 2008 he had accepted a plea agreement in which he would be required to serve an eight-year prison sentence. However, Mr. McLaughlin backed out of that agreement in February 2008. Mr.

McLaughlin also noted that he participated in the wire recordings three months before he accepted a plea agreement with an eight-year sentence to be served on probation. Mr. McLaughlin insisted that he did not need the detectives' help with his "charges." Mr. McLaughlin also insisted at trial that he had testified truthfully.

Mr. McLaughlin admitted on cross-examination that in phone conversations with his family, he had stated that he "didn't want to be screwed over by the police yet again." Mr. McLaughlin also admitted that he said that he knew the police could not promise him "anything up front," but that he trusted that they would "help [him] out." Mr. McLaughlin further admitted that he told his family that if the police would not "help" him then he was "going to blow the whole deal for them." However, Mr. McLaughlin insisted that when he referred to the police helping him out, he meant that the police would move him "if anything went wrong," and not that they would help him out with his charges. Mr. McLaughlin insisted that he only wanted the police to protect him if he was "found out" by the other inmates.

Dan Hamm testified that he was the Assistant District Attorney General who handled Mr. McLaughlin's cases. General Hamm testified that he was aware that Mr. McLaughlin had cooperated in this case, but that he did not know what information Mr. McLaughlin had provided in this case and that Mr. McLaughlin's cooperation in this case did not factor into the plea agreement. General Hamm testified that he had already reached an agreement with Mr. McLaughlin's attorney before he found out about Mr. McLaughlin's cooperation in this case.

The State also recalled Det. Freeman following Mr. McLaughlin's testimony. Det. Freeman testified that Mr. McLaughlin was never offered anything in "exchange for wearing the wires" or to testify at trial. Det. Freeman also testified that he "corroborated" the information Mr. McLaughlin had given him "prior to going forward with the body wires." On cross-examination, Det. Freeman admitted that he did not remember if, during their first meeting, Mr. McLaughlin mentioned the Defendant's wanting to kill anyone besides Ms. Young. Det. Freeman also admitted that Mr. McLaughlin agreed to wear a body wire at their first meeting on April 28, 2008, and that Mr. McLaughlin did not say he needed time to think about it. Det. Freeman further admitted that none of the papers Mr. McLaughlin gave him "contained any information about an alleged solicitation to commit murder."

Mr. McLaughlin told Det. Freeman that he had other "documentation" in his cell, but he never produced those documents to the detectives. Det. Freeman testified that Mr. McLaughlin's cell was searched by Sheriff's deputies, but they did not find any documents that pertained to the solicitation. After Det. Freeman's testimony, the defense called Davidson County Sheriff's Deputy Orlando Tippins to the stand. Deputy Tippins testified

that he was a guard on the fifth floor of the CJC when Mr. McLaughlin was there. Deputy Tippins testified that, in his opinion, Mr. McLaughlin was an untruthful person.

### III. Solicitation of Michael Jenkins

Sgt. Postiglione testified that around July 10, 2008, he received a letter from Michael Jenkins. Mr. Jenkins had been housed on the fifth floor of the CJC with the Defendant earlier in 2008. As a result of the letter, Sgt. Postiglione and Det. Freeman interviewed Mr. Jenkins. However, at the time Mr. Jenkins was housed at a different correctional facility and no longer had access to the Defendant; therefore, the detectives could not conduct another wire operation.

At trial, Mr. Jenkins testified that he was on the fifth floor of the CJC with the Defendant in February of 2008 and from May 29, 2008 until June 5, 2008. According to Mr. Jenkins, during that time the Defendant discussed the facts of his murder charge with Mr. Jenkins. Mr. Jenkins testified that the Defendant became "very angry and upset" after the Defendant learned that Mr. McLaughlin "had been recording their conversations." According to Mr. Jenkins, a short time later, the Defendant approached him and "was very angry and he wanted somebody to kill the two officers." Mr. Jenkins testified that the Defendant never gave him "the names of [the] officers, but everybody knew" who they were. Mr. Jenkins went on to explain that the Defendant was referring to "the arresting officers" who had stopped him at the TA.

According to Mr. Jenkins, the Defendant stated that "he blamed them for all of his problems . . . he blamed them for everything" including the recent death of the Defendant's wife. Mr. Jenkins described the Defendant as "very belligerent about those two officers." Mr. Jenkins testified that the Defendant told him "point blank" that he "wanted those officers dead." Mr. Jenkins further testified that the Defendant was "very serious" about wanting to kill Sgt. Postiglione and Det. Freeman. According to Mr. Jenkins, the Defendant asked Mr. Jenkins to kill "the two officers," and Mr. Jenkins said yes because he thought he "needed to keep [the Defendant] close to [him] and relay" the information to the police chief.

Mr. Jenkins testified that the Defendant offered him $15,000 to kill Sgt. Postiglione and Det. Freeman. Mr. Jenkins further testified that the Defendant told him that the Defendant "was due some money." Mr. Jenkins thought "it was probably from his wife's death." According to Mr. Jenkins, he had "several" conversations with the Defendant about killing the detectives. Mr. Jenkins testified that on one occasion, the Defendant asked him "to pull [his] shirt up" to show the Defendant that he was not wearing a wire. Mr. Jenkins also testified that the Defendant told him things that were said on the wire recordings with Mr. McLaughlin. Mr. Jenkins recalled that the Defendant told him that Mr. McLaughlin said

"that he would take the same caliber gun and shoot someone to make it look like that the killer was still out there" and that the Defendant said he told Mr. McLaughlin "to do what you do." On cross-examination, Mr. Jenkins admitted that he told the police that he thought Mr. McLaughlin was a liar.

Mr. Jenkins testified that he was currently serving a ten-year sentence in the Tennessee Department of Correction, that he had "battled drug and alcohol" abuse through much of his life, and that he had a "lengthy" criminal history. Mr. Jenkins also admitted that while he had various charges pending he wrote "a lot of letters to different people" offering to be a police informant. On cross-examination, Mr. Jenkins admitted that in his letter to the police, he got the Defendant's name wrong, referring to him as Mr. Mendenhoff. Mr. Jenkins also admitted that he told no one about his conversations with the Defendant until after he was arrested on new charges on June 18, 2008.

*IV. Jail Letters and Phone Calls*

In addition to the foregoing evidence, the State also presented redacted excerpts from several phone conversations the Defendant had while incarcerated and several letters the Defendant sent from jail. At trial, Det. Freeman testified that it was typical for investigators to listen to a defendant's "jail phone calls" after a defendant's arrest. Kevin Carroll, an internal affairs investigator with the DCSD, testified that the jail's "telephone system records all outgoing phone calls that inmates . . . make." Mr. Carroll also testified that at "the beginning of each recorded phone call, there is a prerecorded tag that says this call may be monitored and recorded." Mr. Carroll received a request from Det. Freeman for the Defendant's "jail calls," retrieved the recordings from the jail's computer system, and provided them to Det. Freeman. Det. Freeman testified that he and Sgt. Postiglione listened to "more than 100 calls" made by the Defendant and that they became familiar with the voices of the Defendant and his family members.

Det. Freeman further testified that based upon statements made by the Defendant in the recorded "jail calls," he obtained a judicial subpoena for copies of the Defendant's mail. Det. Freeman explained that the Defendant "stated in certain calls that he was going to have to write it in a letter about finding alibis and other things." Mr. Carroll testified that all inmates at the CJC were provided a handbook that stated that "their mail may be read and it may be turned over to law enforcement." Mr. Carroll further testified that it was common to get judicial subpoenas for an inmate's mail and that inmate mail could also be scanned "out of concerns for jail safety and security." Mr. Carroll testified that he received and complied with the judicial subpoena to copy the Defendant's mail. Mr. Carroll also testified that the Defendant was not alerted to the fact that his mail was being intercepted. Det. Freeman testified that he and Sgt. Postiglione read almost 500 letters written by the

Defendant and that they became familiar with the Defendant's handwriting and the people the Defendant wrote to.

The phone calls and letters can be separated into the following categories: (1) calls and letters which referred to Ms. Young, Mr. Kiem, and Mr. Powell and the Defendant's belief that they were responsible for framing him for Ms. Hulbert's murder; (2) calls and letters which referred to Sgt. Postiglione and Det. Freeman and the Defendant's belief that they were also responsible for framing him for Ms. Hulbert's murder; (3) calls and letters that corroborated Mr. McLaughlin and Mr. Jenkins' testimony; (4) calls and letters in which the Defendant stated that he needed an alibi or attempted to fabricate an alibi; and (5) letters written after June 5, 2008. Det. Freeman admitted at trial that at no point in the calls or letters did the Defendant discuss "a scheme where someone [had] been hired to commit a murder on his behalf" or ask "anyone to commit murder on his behalf."

### A. Calls and Letters Regarding Ms. Young, Mr. Kiem, and Mr. Powell

In a phone conversation with his wife from August 7, 2007, the Defendant stated, "She's [(referring to Ms. Young)] got me tied up pretty good." When the Defendant's wife asked him who he was referring to, the Defendant responded, "Well, who do you f--king think? Who have I been searching for all these months?" The Defendant's wife told him that Ms. Young had "been blabbing." The Defendant responded that his "lawyers" had told him that and that Ms. Young was "smiling, so that's a plus on me." Later in the conversation, the Defendant stated, "But you know, how long we [sic] been looking for her? And our lawyers we hired couldn't find her . . . . My lawyers found her in two days." The Defendant's wife informed him that Ms. Young had been "[p]utting [him] down." The Defendant then stated that he heard that Ms. Young had said that he was "a good guy." The Defendant's wife responded that Ms. Young had said that at first and "then she said some other things." The Defendant warned his wife to "keep it off that air." Later in the conversation, the Defendant asked his wife to have their daughter "text [Ms. Young] and ask the questions" on their daughter's "untapped line."

In a phone conversation with his wife from August 10, 2007, the Defendant discussed the fact that Ms. Young had a recent conviction for driving under the influence. The Defendant's wife stated that Ms. Young got out of the charge by paying "a hundred bucks." The Defendant then stated that was the type of thing his attorneys wanted "the jury to hear . . . [w]hat [he] was up against with [Ms. Young]." The Defendant stated that would paint "a better picture" for him. The Defendant's wife then asked him if he knew that their phone call was monitored. The Defendant responded that he did and that he was not saying anything that he was not supposed to. Later in the conversation, the Defendant's wife told

the Defendant about a newspaper article that described Ms. Young as the Defendant's "girlfriend."

In a phone conversation with his wife and one of their daughters from August 18, 2007, the Defendant discussed the news coverage of his case in a "rag paper" called "Disclosure." The Defendant's wife stated that someone interviewed in the paper said Ms. Young "was a prostitute." The Defendant then stated that he guessed he "pissed [Ms. Young] off enough" because his attorney told him that she "wouldn't shut her mouth." The Defendant and his wife hoped that his attorney would "see through" Ms. Young. The Defendant told his wife and daughter that his attorneys had "found everybody but one." The Defendant's wife asked if Mr. Kiem was still missing. The Defendant told her that they had found Mr. Kiem, but Mr. Powell was stilling missing, and the Defendant's wife then referred to Mr. Powell as "d--khead."

In a phone conversation with his son from August 22, 2007, the Defendant stated that he "hired them [sic] two lawyers, to you know, look, to look for you know who [(referring to Ms. Young)]." The Defendant then stated that those attorneys "couldn't find her in six years," but that his new attorneys found Ms. Young in two days.

In a phone conversation with his wife from August 29, 2007, the Defendant again stated that he had "hired a lawyer to look for [Ms. Young], to get [his] money" and that after six years they "never did really find her." However, the Defendant stated that during that time Ms. Young "was finding [him]." The Defendant stated that it took his new attorneys only two days to find Ms. Young. The Defendant's wife pointed out that this was after Ms. Young "came out in the paper" with a story that she had ridden in the Defendant's truck for "three or four days" and what "saved" her was the fact that she was not a prostitute. The Defendant insisted that his attorneys found Ms. Young before her story had been published. The Defendant then stated that his attorneys had found everyone except for Mr. Powell.

In a phone conversation with his wife from September 17, 2007, the Defendant stated that he wished he knew Ms. Young's "so called husband's address" so he could "write him a letter and let him . . . wise up to things." The Defendant's wife informed the Defendant that Ms. Young's husband was a "truck driver too." The Defendant responded that Ms. Young "always picks on truck drivers. That's for sure." The Defendant continued discussing Ms. Young's husband in a phone conversation with his wife on September 24, 2007. In that conversation, the Defendant stated that no one believed him that Ms. Young could frame him and that the only reason for that was because no one knew Ms. Young like he did. The following exchange then occurred:

[Defendant's wife]: Lori or Lori's husband.

[The Defendant]: Yeah. I don't know him. So, I wouldn't, uh, put it on him.

[Defendant's wife]: Well, I know, in the Disclosure they said he was a hothead.

[The Defendant]: Um. Well, like I said, you outta write him and tell him he's next on the list.

[Defendant's wife]: Yeah, she's setting him up real good, isn't she? I don't know she might be scared of him.

[The Defendant]: Huh?

[Defendant's wife]: She may be scared of him.

[The Defendant]: She ain't scared of nobody. She uses the law against everyone of us.

In a phone conversation with his wife and one of their daughters from September 28, 2007, the Defendant's wife advised him to "keep [his] enemies closer." The Defendant complained that he tried to do that with Ms. Young, but he "got bit." In a later conversation with his wife from October 15, 2007, the Defendant stated that Ms. Young "stacked it good" against him. The Defendant's wife stated that she did not think Ms. Young had framed the Defendant by herself and that she thought "there's more people to it." Later, the Defendant stated that he had asked one of his daughters to get information on Ms. Young.

In a phone conversation with his wife from October 22, 2007, the Defendant complained that no one was "going after" Ms. Young. The Defendant stated that Ms. Young could "allegate [sic] against the guys and they arrest 'em. But you turn it around, you have to prove it." The Defendant further stated that he was "up against a brick wall and no where to knock it down." In a later conversation on November 30, 2007, the Defendant stated that Ms. Young, Mr. Kiem, and Mr. Powell had "alibied theirselves [sic]." The Defendant's wife stated that their alibis were "fake."

Exhibit 16 at trial was a letter from the Defendant to one of his daughters dated January 9, 2008. In the letter, the Defendant stated that Ms. Young and Mr. Kiem had him "pretty well hemmed up here trying to prove that [he] didn't do it and they alibied each other." The Defendant also stated that "Mr. F'n Powell got alibied he was at work." The Defendant then stated that because Ms. Young, Mr. Kiem, and Mr. Powell had alibis, he would need someone to say that they saw him on the night of the murder. Later in the letter, the Defendant stated that he believed his daughters were "the target of [Ms. Young and Mr. Kiem's] threats." The Defendant told his daughter that he believed Ms. Young and Mr. Kiem had "screwed with" her car after they had spoken to his attorneys. The Defendant then asked his daughter to help him by "getting someone to trick them into getting them to talking

about coming after [him], setting [him] up, like [his daughter] said Powell was doing that one night."

The January 9, 2008 letter continued with the Defendant making the following statement about Ms. Young:

> I always jumped your mom for not kicking Lori's ass when she beat on you, but I found out the hard way it's not possible because she knew she had to have help getting me down. So she brought Ritchie and David with her and always came out of the dark or blindsided me. And I realized your mom didn't stand a chance against her and neither did you. So that's why last year you hardly ever heard me cut your mom down for not protecting you because I was at the other end of it. I was not very proud of myself but they didn't know what she was up to until the day that I was arrested, but it was too late.

The Defendant concluded the letter by stating his version of the events that led up to his arrest.

In Exhibit 18, a letter from the Defendant to his "pen pal" Katie Collins and dated February 22, 2008, the Defendant asked Ms. Collins if she knew Ms. Young. The Defendant then told Ms. Collins where he thought Ms. Young was and asked Ms. Collins to write to Ms. Young "like you're her friend and you hate [the Defendant]. Find out all of the info you can, please. It would be real helpful."

Exhibit 21 was a letter from the Defendant to his wife and daughters dated March 2008. In the letter, the Defendant asked if there was anything about him or Ms. Young "in the paper." The Defendant referred to Ms. Young as "the b---h." The Defendant then stated that he had learned the name of Ms. Young's husband and some information about him. After complaining about the detectives in his case, the Defendant then asked if his family remembered "the night [they] went looking for" Mr. Kiem after they saw him drive by their house. The Defendant claimed that he could not find Mr. Kiem that night because Ms. Young had helped Mr. Kiem hide his car. The Defendant claimed that Mr. Kiem lied by saying that he had "never [] driven a car" and that Mr. Powell lied by saying that "he hasn't been around [them] since 2002." The Defendant implored his family to give "any info" to his attorneys to help "back [him] up." The Defendant also claimed that a friend had stated that Mr. Powell "was still in the area in 2005 or 2006."

Later in Exhibit 21, the Defendant asked his family to "run the computer to a newspaper in [the town of] Only about Powell's arrest for not reporting and [Mr. Kiem's] losing his driver's license for [a] DUI wreck." The Defendant stated that this information

would "help support [him] saying [he] saw them." The Defendant then stated that he recalled an incident when Mr. Kiem and Ms. Young drove by his house. The Defendant elaborated stating as follows:

> Richie and Lori drove by with Richie behind the wheel, but I need help proving Richie and David are big ass liars. Richie is saying Lori was with him at home, so proving him a liar would be a must.

The Defendant concluded the letter by stating that he was "nervous Lori might win," and he would never get to go home.

In Exhibit 23, a letter from March 2, 2008, the Defendant stated Ms. Young's alleged attempt to frame him was "one hell of a set up." The Defendant also stated that he had not killed anyone, but that it was "stack[ed] really good" and that it was "enough to make you wonder how in the f--k did Lori manage it?" In Exhibit 24, a letter from the Defendant to his "pen pal" Ms. Collins dated March 4, 2008, the Defendant stated that he asked Ms. Collins "to keep tabs on Ms. Lori Young [] because she has a history of getting men in trouble with [the] law." The Defendant claimed that while these men were "in jail fighting to prove their innocence," Ms. Young would "disappear[] under the radar, [and] assume[] a different identity." The Defendant also claimed that when Ms. Young "started messing with" him, he contacted the police, "but she was sexually involved with them from our state's attorney down to the chief of police, so [he] was banging [his] head against the wall." The Defendant then went on a rant about the unfairness of the judicial system and how the detectives in his case had framed him.

In Exhibit 28, a letter from the Defendant to his daughter dated March 13, 2008, the Defendant stated that Mr. Kiem was lying about having not driven. The Defendant stated that he had people checking court and police records on Mr. Kiem so that any information they found could be used so that when Mr. Kiem's "bearded fat ass gets on the stand and lies" the Defendant's attorneys would "have the ammo available."

Exhibit 29 was a letter from the Defendant to one of his daughters dated March 19, 2008. In the letter, the Defendant stated that making Mr. Kiem and Mr. Powell "out to be F'n liars" was "real important because it supports what [he had] been saying." The Defendant then stated what he believed to be Mr. Kiem and Mr. Powell's various lies, "So far they say they have not seen me and you since 2001 and Richie never has driven a vehicle. And I'm the one that killed your cat and her little kittens." The Defendant complained that "someone who doesn't know me ain't going to believe unless someone other than family says" that he was telling the truth. The Defendant then stated that he would not speak to the

media about Ms. Young's alleged plot to frame him but instead would follow his attorney's advice and win his case "a step at a time."

In Exhibit 36, a letter to the Defendant's wife dated April 25, 2008, the Defendant stated that he was frustrated with his social worker because she wanted to know why he was "setting Lori up with these crimes." In Exhibit 37, a letter to one of the Defendant's daughters dated April 25, 2008, the Defendant also complained about his social worker asking why he was "trying to frame Lori." The Defendant asked his social worker "who's framing who here? The evidence is pointing toward me, not her, so who's doing the framing?" The Defendant then asked his daughter to "find out when did David Powell move to Anderson, Indiana," so they could prove that he was "still in the area in 2006 or 2005." The Defendant also stated that he had someone else looking up information on Ms. Young and Mr. Kiem.

In Exhibit 39, a letter dated April 30, 2008, the Defendant told one of his daughters to "watch" herself "a lot" because "Lori [had] been released." In a phone conversation with his wife from May 4, 2008, the Defendant told his wife to warn their family "to start watching their backs closer, Lori's on the loose." In another phone conversation with his wife on May 6, 2008, the Defendant stated that Ms. Young was "on the loose," that she had been in jail in Kentucky, and that "they let her go." The Defendant stated that "one of the guys here, he found out she got two years probation." The Defendant told his wife that he was not sure if it was true, but that he wanted his family to "watch you guys' back [sic], real good now." In a phone conversation with his wife on May 10, 2008, the Defendant stated "[l]ook out, look . . . [s]he is, she is on the loose. She's got a two year probation."

Exhibit 54 was a letter from the Defendant to his wife dated May 11, 2008. In the letter the Defendant claimed that he was being framed and that he was worried about his family being "safe . . . from Lori." The Defendant reiterated what he had told his wife in an earlier phone conversation that she needed to "watch [her] damn back[] because Lori's up to something." The Defendant concluded the letter by stating that "something is smelling bad."

### B. Calls and Letters Regarding Sgt. Postiglione and Det. Freeman

In a phone conversation with his son from August 20, 2007, the Defendant stated that Sgt. Postiglione "needed to clear his desk" so he "wouldn't have an open case laying [sic] on his desk, when he retired." The Defendant claimed that he was Sgt. Postiglione's "bait." Later in the conversation, the Defendant stated that the "arresting officer" had "blinders on" and could not see what had really happened with Ms. Hulbert's murder. The Defendant then reiterated that "when you got a detective getting ready to retire, you know, he don't want that

on his desk when he walks out the door." The Defendant's son responded that Sgt. Postiglione would have a lawsuit "on his desk before he walks out that door." The Defendant's son further stated that Sgt. Postiglione "jumped the gun . . . and he's gotta pay the price for that." The Defendant made a similar statement on August 25, 2007. The Defendant claimed that Sgt. Postiglione "just wanted to clear his desk before he retired" and that the Defendant was "his scapegoat."

In a phone conversation with his son from August 28, 2007, the Defendant stated that Sgt. Postiglione "ain't gonna let [his case] die." The Defendant stated that Sgt. Postiglione kept his case in the news by "putting everything on the internet and s--t." In a later phone conversation with his wife on October 26, 2007, the Defendant stated that someone had asked him in a letter if he needed anything and that he responded "[j]ust two cops' badges is all."

In Exhibit 16, a letter from the Defendant to one of his daughters dated January 9, 2008, the Defendant stated his version of his encounter with Sgt. Postiglione on July 12, 2007. In the letter the Defendant referred to Sgt. Postiglione as a "q---r looking gentleman," a "q---r," "Mr. Q---r," and "q---r boy." The Defendant claimed that he initially refused to speak to Sgt. Postiglione but eventually got out of his truck. The Defendant further claimed that he never consented to Sgt. Postiglione searching his truck and that Sgt. Postiglione ran past him to get inside his truck while he spoke to Det. Freeman. According to the Defendant, the detectives began to accuse him of Ms. Hulbert's murder almost immediately, and Sgt. Postiglione stated that he would bet "his badge" that the Defendant's DNA and shoe prints would be found at the murder scene. The Defendant then claimed that Sgt. Postiglione began "tearing trash bags open" and questioning him. The Defendant claimed that he was handcuffed for refusing to answer Sgt. Postiglione's questions. The Defendant further claimed that he was tricked into signing the consent to search form because the detectives told him it was a second consent form for a DNA sample.

Exhibit 17 was a letter from the Defendant to his wife and daughters dated February 15, 2008. In the letter the Defendant stated that nothing was going on with his case, "just more time for the detectives to fabricate more s--t." Exhibit 19 was a letter from the Defendant to one of his sisters dated February 21, 2008. In the letter, the Defendant stated that the "two detectives" had "people in a frenzy down here" by spreading "rumors" and "lies" about him. The Defendant stated that he wanted "the SOB's job and his retirement benefits" so that "the next detective might think more than once about putting his badge on the line like these have done." The Defendant concluded the letter by stating that it was unfair that he was being treated as guilty until proven innocent but that the detectives were "innocent until you prove them guilty." The Defendant stated that he felt that was a "little ass backwards."

-30-

Exhibit 20 was an undated letter from the Defendant to Katie Collins. In the letter, the Defendant stated that the police had arrested him and "then started trying to make the crime scene fit." The Defendant then made the following cryptic statement, "One by one is gone, bye-bye and that one so long. I would elaborate more, but my lawyers say watch it so I do." In Exhibit 21, the Defendant stated that when anyone referred "to the two detectives," he would say "f--k them" and that the detectives were "two-faced lying SOB[s]." The Defendant also stated that the "two detectives [were] contradicting themselves."

Exhibit 22 was a letter from the Defendant to one of his sisters dated March 2, 2008. In the letter, the Defendant again claimed that the detectives had tricked him into signing a consent to search form by telling him it was a consent form for providing a DNA sample. The Defendant also claimed that the detectives "dubbed" the tape of his interview and planted evidence in his truck to make him appear guilty. The Defendant then stated that he was charged with murder "because two detectives can't pull their heads out of their asses if you drew them a map on how."

In Exhibit 24, a letter dated March 4, 2008, the Defendant told his "pen pal" Ms. Collins that he had "a finger on each hand, and it's the middle one, aimed at anyone who is connected to the law." Later, the Defendant stated that he was "pissed" because he had "to prove the detectives wrong" and that a "little injustice goes a long way." The Defendant then told Ms. Collins to make sure that her boyfriend wore gloves whenever he threw trash away and always had an alibi because the TA would "do whatever somebody tells them, lies, cheats, makes s--t up." Later, the Defendant stated that the detectives had "everyone scared from the TA workers to the pimps, drug dealers, and prostitutes."

Exhibit 27 was a letter from March 2008, with the Defendant writing to one of his sisters. In the letter, the Defendant stated that "it still hurts that these detectives can spread such BS and [nothing] gets done to stop it." Later in the letter, the Defendant recalled a conversation in which someone told him that they would send the detectives "to jail for being such blundering idiots." In Exhibit 28, a letter from March 13, 2008, the Defendant stated that the police were framing him because he looked "like a good patsy." The Defendant also warned his daughter to "watch who you talk or write to because it could be a cop or police informant trying to make [him] sound like a liar."

Exhibit 31 was a letter from the Defendant to his daughter dated April 1, 2008. In the letter, the Defendant stated that he wanted the "public to know what kind of crooked detectives they have and put it on TV and newspaper nationwide like they did when [he] was arrested." The Defendant stated that he would "burn" the detectives "the same way" they had burned him.

Exhibit 32 was a letter from the Defendant to Ms. Collins dated April 11, 2008. In the letter, the Defendant stated that Ms. Young had always said that "cops are f--king idiots who can't pull their heads out of their own ass even if you gave them step by step instructions." The Defendant then stated that he wanted "two crooked as a dog's hind leg detectives' badges," and that one of the detectives had just won an award that he was "going to tarnish." Exhibit 33 was a letter from the Defendant to Christina Edwards, another "pen pal," and dated April 19, 2008. In the letter, the Defendant described Sgt. Postiglione and Det. Freeman as "two crooked detectives who couldn't pull their own heads out of their asses if you handed them step by step instructions."

Exhibit 34 was two separate letters that were mailed in the same envelope. In the first letter the Defendant wrote to one of his daughters that he was going to "miss a lot of s--t" because he could not get anyone "to step forward for [him] because they are scared of these cops." The second letter was dated April 9, 2008, and addressed to the Defendant's wife. In that letter the Defendant stated that he was "going down a fighting, tarnishing a couple of badges as" he went. Later, the Defendant stated that there was "nothing that a few dead detectives wouldn't cure." Further in the letter, the Defendant stated that "[l]ike Lori said, cops are a bunch of dumbasses who can't pull their heads out of their own asses if you handed them step by step instructions! Right!"

In Exhibit 35, a letter from the Defendant to his son dated April 23, 2008, the Defendant referred to Sgt. Postiglione and Det. Freeman as "assholes" and liars. The Defendant stated that everything the detectives said about him was "a lie," and that "[t]hese detectives lying was bad enough," but now his own son was questioning him. The Defendant accused the detectives of dubbing the recording of his interview and pulling "this case out from under another [detective] and [causing] that one to lose his job." The Defendant also noted that the detectives were tapping "phone calls." The Defendant concluded by saying that there were a "bunch of FN' questions and no answers."

In Exhibit 38, a letter from the Defendant to his son dated April 30, 2008, the Defendant stated that he needed alibis "badly because the detectives are helping frame [him] good." The Defendant also stated that one detective "was overheard saying he would frame anyone fitting close to it so it wouldn't be on his desk when he retired." Later in the letter, the Defendant stated, "I hope when you get the picture of your asshole taken, have Detective Freeman on one cheek and have the other Detective Postiglione." The Defendant then asked his son if he could "shed some positive light on [his] case by going after them." The Defendant told his son to keep his "head up and quit listening to the news, it's all bulls--t created by these crooked detectives and they are so far under water they are doing everything they can to survive the explosion coming." The Defendant then told his son to quit "worrying on what the assholes say."

-32-

Exhibit 52 was a letter from the Defendant to his son dated April 1, 2008. In the letter, the Defendant accused the police of hiding evidence "in a storage place at Metro police station." The Defendant stated that Sgt. Postiglione and Det. Freeman had "ruined [his] family's life and [his] life so [he] will go to court and try to ruin two detectives' lives as well." The Defendant further stated that the detectives had ruined his life "worldwide," so he wanted "these crooked S.O.B.'s [sic] lives ruined on TV as well." The Defendant then stated that he hoped he would win his trial, but the detectives had "done a damn good frame up." The Defendant stated that he wanted to show the world "how crooked Nashville detectives will stoop to say they solved a crime." The Defendant claimed again that he was being framed by Sgt. Postiglione and Det. Freeman. The Defendant concluded the letter by telling his son to "never ever trust a detective. Never ever let them in your house. Never ever let them search your vehicle without [a] legal warrant."

In Exhibit 53, a letter from the Defendant to one of his sisters dated April 1, 2008, the Defendant stated Sgt. Postiglione and Det. Freeman had ruined his life and his family's lives and that he wanted "the news channels and paper to ruin these two detectives' lives, show everyone how hind leg crooked these assholes are." Exhibit 55 was a letter from the Defendant to a "pen pal" named Vanessa Ellis dated May 15, 2008. In the letter, the Defendant stated that "the detectives covered their track real good" in planting evidence and framing him for murder. The Defendant then stated that his attorneys would "have to do their jobs as crooked as the detectives." The Defendant claimed that the FBI had planted "two snitches" in his cell block and explained that was why he asked Ms. Ellis to send him "some skimpy clothing pictures, 'cause a cop will not expose their bodies."

Exhibit 57 was a letter written after the Defendant learned about the police intercepting his mail and Mr. McLaughlin. The Defendant stated that he knew incoming mail "was checked for contraband," but he thought that "the law says once an envelope is sealed and placed in a mailbox it becomes federal property." The Defendant complained that "[t]hese assholes bend the rules to suit theirselves." The Defendant then stated that he "just added two more people to [his] drop dead list so the detectives won't feel alone: C-4 and the DA, both crooks." The Defendant concluded the letter by stating that he would not "elaborate on [anything] else" in his letters.

*C. Calls and Letters Corroborating Mr. McLaughlin and Mr. Jenkins' Testimony*

In a recorded phone conversation with his wife from March 25, 2008, the Defendant stated that a fellow inmate had just been convicted of ordering "a hit, a kill" on someone even though "he wasn't even around." The Defendant stated that he could not believe that a conviction could be based upon "that hearsay bulls--t" and that "hopefully" he would not "get something like that done to [him]."

Exhibit 36 was a letter from the Defendant to his wife dated April 25, 2008. In the letter the Defendant referred to his conversations with Mr. McLaughlin. The Defendant stated that "another guy [had been] brought up whose uncle owns a trucking company, [and] he's setting me up with a high dollar run when I get out, which he says I will." The Defendant stated that he told Mr. McLaughlin that his wife, kids, or brother would ride with him because he "won't be set up again." According to the Defendant, Mr. McLaughlin stated that "his uncle wouldn't care who rides with [him] as long as [he] did the run." The Defendant then described the route he was supposed to drive for Mr. McLaughlin's uncle. Later in the letter, the Defendant stated that Mr. McLaughlin told him he would "have no problem" winning his case. Mr. McLaughlin then stated that the FBI had put "one of their guys two cells down" from the Defendant "trying to get [him] to say something." The Defendant concluded that he was "pissing [them] off" because they could not get anything out of him.

Exhibit 37 was a letter from the Defendant to one of his daughters dated April 25, 2008. In the letter, the Defendant asked his daughter to "get on the internet and look up Roy McLaughlin, get a picture of him, if possible, and send all [the] info you can." The Defendant stated that Mr. McLaughlin had told him that "he bombed the building in New York" and that he had been "in jail here for around two years." The Defendant explained that Mr. McLaughlin had been "released [] out on bail and was rearrested a couple of months ago." Later in the letter, the Defendant stated that there was "a guy who's saying I will walk from these charges and his uncle would like me to drive for him." The Defendant then described the route and stated that he would not "even tell him okay if no one will ride with me. Ain't going to get set up again, that's for damn sure." The Defendant stated that Mr. McLaughlin told him he would make around $2,000 to $3,000 a week. The Defendant stated that Mr. McLaughlin also stated that he would try to get the Defendant's brother a job with his uncle because the Defendant's brother was unable to get work after the Defendant's arrest. The Defendant concluded the letter by stating that after he "beat these charges," neither one of them would "have to worry about money anymore."

In Exhibit 38, a letter to the Defendant's son dated April 30, 2008, the Defendant stated that there was "another truck driver in here for carrying a cargo of C-4 and detonators in his jeep going home from work." The Defendant stated that Mr. McLaughlin "said he would help alibi me with some of his friends, [and] asked where did I need it." The Defendant told Mr. McLaughlin "let me count the ways" and "was looking up at the sky." The Defendant stated that Mr. McLaughlin "laughed" and told him that he was "serious." The Defendant responded, "so am I." In Exhibit 39, a letter to one of the Defendant's daughters dated April 30, 2008, the Defendant asked his daughter if she would be willing to drive a truck for him. The Defendant told her that he had "a guy who said he would hook" him up with "his uncle making runs." The Defendant stated that Mr. McLaughlin told him

that if the Defendant could get drivers for his uncle's company, his uncle would hire the Defendant when the Defendant got out of prison. The Defendant also stated that someone would have to ride with him so he would not "get set up again."

In a phone conversation with one of his sisters from May 5, 2008, the Defendant stated that he was "being such a good cat and mouse game player they brought another [confidential informant] up here." The Defendant stated that there were informants on both sides of his cell. The Defendant told his sister that he would walk and talk on the roof with another inmate nicknamed C-4 and that his nickname was C-Truck. The Defendant explained that Mr. McLaughlin was nicknamed C-4 because "he likes to play with plastic explosives." The Defendant claimed that while he was talking to Mr. McLaughlin, another inmate approached him and tried to talk to him about being at the Pilot truck stop in Nashville. The Defendant stated that Mr. McLaughlin told him "that motherf--ker's CI." The Defendant agreed with Mr. McLaughlin. The Defendant then stated that because he was in "county jail" the police "can't use a wire."

A phone conversation from June 1, 2008, between the Defendant and one of his sisters was played for the jury. In the conversation the two discussed the Defendant's wife's life insurance policies. In Exhibit 60, a letter dated August 3, 2008, the Defendant asked one of his daughters if she had checked on his wife's life insurance policy and stated that he thought the policy was worth $15,000 or $16,000. Det. Freeman testified that the amount mentioned in the letter was significant because Mr. Jenkins had stated that the Defendant asked him to kill Sgt. Postiglione and Det. Freeman for a "down payment" of $15,000.

Exhibit 58 was a letter from the Defendant to Ms. Ellis dated June 2, 2008. In the letter, written after the Defendant learned that Mr. McLaughlin had been a police informant, the Defendant stated that it was his fault "for believing who he was and what he was capable of doing and not caring about innocent people in the way, his term he used was casualty of war." The Defendant then stated that Mr. McLaughlin "got what he wanted when he wanted, nothing got in his way to obtain it."

*D. Calls and Letters Regarding an Alibi or Attempts to Fabricate an Alibi*

In a phone conversation with his son from August 27, 2007, the Defendant stated that the case against him was "stacked so good, [he] may not get out." The Defendant reiterated that he "couldn't believe how good it was stacked." Later in the conversation, the Defendant stated that the "way these things [were] stacked on [him], it's gonna be a longer time for [him]." The following exchange then occurred:

[The Defendant]: But, trying to find alibis for when they're saying this s--t happened. That's what's hard. Finding them. Remembering dates, times.

[Defendant's son]: Um-hmm.

[The Defendant]: I go. About the only way to get one is to lie about one.

[Defendant's son]: Right. Can't do that.

[The Defendant]: No. Well, you could, if you could talk to somebody about doing it. I mean, you know, like me and you talking right now, you know, they'd hear and know about it before you did it. You know what I mean? So, it wouldn't be no good.

[Defendant's son]: Right.

[The Defendant]: Oh well.

In a phone conversation with his wife from October 8, 2007, the Defendant stated that he would not be able to go home unless he got "some alibis here." The Defendant also stated that unless he could "get an alibi" he would be "done." Later in the conversation, the Defendant reiterated that he had to "have alibis." In a phone conversation on October 12, 2007, the Defendant informed his wife that their son had told the Defendant that he would not be an alibi for the Defendant. The Defendant reiterated that the "only way to beat this system down here is with alibis." The Defendant's wife then reminded him that their phone conversation was being recorded. The Defendant responded that "the only thing they record is if you talk about uh, trying to get out." The Defendant's wife then stated that she had something to say, but she was not sure if she could say it over the phone. The Defendant told her to write it in a letter. The Defendant stated that he knew the jail read incoming mail but he did not know about outgoing mail.

In a phone conversation with his wife from October 22, 2007, the Defendant told her that he had to prove that he told the police that he wanted a lawyer and that they could not search his truck. The Defendant's wife asked how he could possibly prove that when the detectives were saying "something different." The Defendant responded that he needed to "get somebody that said, you know, they over heard [him] saying it." The Defendant concluded that was "hard to do." The following exchange then occurred:

[The Defendant]: In other words, if I can get, you know like, Aries or somebody like that to say, "Well I was walking down the railroad tracks when they [were] trying to arrest this guy and, we snuck down into some higher grass, and listened and we heard the driver say, 'No you can't search my truck, and I want [a] lawyer.'" You know something like that . . . .

[Defendant's wife]: Well, it didn't happen.

[The Defendant]: Well, you get my drift.

[Defendant's wife]: Yeah, I get your drift.

-36-

The Defendant later reiterated that he needed an alibi because "they just stacked a lot of s--t on [him]." The Defendant stated that he needed to "get somebody to lie for [him] to get out of it" and that he needed to "come up with some alibis." The Defendant's wife interrupted him and reminded him that their conversation was being recorded. The Defendant responded that he had "said nothing wrong." After discussing Ms. Young, the Defendant stated that he was "gonna have to come up with people that you know, wasn't there that says they were." The Defendant's wife again reminded him that their conversation was being recorded, and the Defendant stated that he was "just saying" that if "somebody comes up and says they were there" he would be "surprised."

In Exhibit 17, the Defendant stated that his wife "better not get jealous of [him] walking around with a hooker and talking even if the hooker testifies" that they had sex because his family would "know better." The Defendant went on to state that he would "not say any different" if a hooker claimed to have had sex with him at the time of the murder because "just that alone [would] be a good alibi."

Exhibit 23 was a letter from the Defendant to Dee Barrett and dated March 2, 2008. In the letter, the Defendant stated that someone named Bud "could muster to help [him] by saying he saw Richie [in] February of 2007 with a gun that looked like his." The Defendant then made the following statements:

> But anyway, if I could use some people to stack s--t right back at these mothers to make them look really stupid! And say you had the killers already behind bars and even know it and laughed at them as I walk away with 20 million. The people you use has to be reliable and trustworthy to pull this s--t off. I need two women really acting like whores and one saying she had [seen] Sara Hulbert a week prior to her death [and Ms. Hulbert had said] she had seen a girl killed by spoiled brat (Lori) and Hollywood and thought maybe she was next. And the other one to say on July 10th she saw my yellow truck and seen my yellow paper in [the] window and knew me and went to the TA to meet me and saw the police around me and heard one policeman in plain clothes, 5'10", 165 pounds, ask me if he could search my truck and heard me say no. And couldn't believe it when they saw him bail into the bunk area. You know that'd end a lot [of] bulls--t . . . . But if there's anyone you know who doesn't live around me that can identify me and wants to help me by acting as a whore just write and say you know a whore and I give you the girl's description. Well, better tell me scene #1 she saw it, or scene #2 saw me. Whore #1 or Whore #2 or both whore. Don't mention no names, they read what you write.

The letter ends with the Defendant stating the following, "So my only luck would be scene #2, but I also will [accept] #1 with it. Sara Hulbert was beautiful blonde with . . . ."

In Exhibit 24, the Defendant stated that he had people offer to provide him a fake alibi for money and that he had turned them down. The Defendant then stated that "now I'm thinking hell anything will do! Right!" Exhibit 25 was a letter from the Defendant to his son and grandson dated March 4, 2008. In the letter, the Defendant stated that he needed "someone to grow some balls and step forward and help [him]." Exhibit 26 was a letter from the Defendant to his sister and nephew also dated March 4, 2008. In the letter, the Defendant stated that he needed "someone" to "grow some balls and stand up against these assholes instead of being scared." The Defendant claimed that he had five witnesses who "saw a white Volvo pull in with the dead woman in his truck and was saw [sic] changing clothes."

In Exhibit 31, a letter dated April 1, 2008, the Defendant asked one of his daughters to tell someone named Bud that when the police interviewed him, "to say that wasn't the gun he left in [the Defendant's] car, but he did see it in Richie's hand when squirrel hunting with him." The Defendant told his daughter that the "DA cannot put the dead woman in [his] truck or the gun in [his] hand so [his] lawyers want[ed] to disprove it when they try to put [the gun] in [his] hands. 10-4 good buddy. Ha ha." The Defendant then told his daughter not to tell his wife about his plan because she would "rant and rave." The Defendant stated that Ms. Young, Mr. Kiem, and Mr. Powell had all lied and that he wanted "to turn it a little back at them." The Defendant then stated that Mr. Kiem had "dark brown eyes, long hair, and [a] full beard."

In Exhibit 38, the Defendant stated that he "needed alibis badly" because the detectives were framing him. The Defendant stated that Mr. McLaughlin had offered to help him get some alibis. The Defendant also told his son to "just cross your fingers my alibis can be found prior to court. I don't like someone to lie, but at this point in the game, I will take anything, right?"

*E. Letters Written After June 5, 2008*

Exhibit 59 was a letter from the Defendant to a fellow inmate named "Ray-Ray" and dated July 7, 2008. In the letter, the Defendant stated that "C-4 turned out to be an F-N' snitch so watch that to be good." Exhibit 61 was another letter to Ray-Ray dated August 8, 2008. In the letter, the Defendant told Ray-Ray not to trust anyone and referred to Mr. McLaughlin as an "asshole." The Defendant further stated that he did not talk about Mr. McLaughlin "very much to anyone" but that Mr. McLaughlin was "lower than snail slime."

Exhibit 62 was a letter from the Defendant to Randy Dee dated August 19, 2008.  In the letter, the Defendant stated that the "FN' rat's name is Roy Lucas McLaughlin" and that as "soon as he snitched on [the Defendant] and two others" he was moved to "protective custody."  The Defendant then asked Mr. Dee to "[t]ell your buddy judge I need his help.  Ha!  Ha!"  Exhibit 63 was also a letter to Randy Dee dated September 7, 2008.  In the letter, the Defendant stated that he learned that Mr. Jenkins was also a "snitch" and that he thought it was "funny" that Mr. Jenkins and Mr. McLaughlin were working with the police.  The Defendant then stated, "Both are saying I hired them but I never said s--t like that, nor did I write it.  The detective must be scared to death that I might go free and he'll be caught with a hand full of s--t which he created."

Exhibit 64 was a letter from the Defendant to his son dated October 1, 2008.  In the letter the Defendant stated that he thought the person in the cell next to him was a "snitch."  The Defendant then stated that Sgt. "Postiglione, stick this guy up your ass."  Exhibit 65 was a letter to Ray-Ray dated October 23, 2008.  In the letter, the Defendant stated that Mr. McLaughlin and Mr. Jenkins were testifying against him and called the situation "bulls--t."

Exhibit 66 was an undated letter from the Defendant to Randy Dee.  In the letter, the Defendant stated that he would "fight for [his] constitutional rights" and that he would make sure "the detectives are going to wear some battle scars, sort of speaking."  The Defendant further elaborated that Sgt. Postiglione and Det. Freeman would "be blackballed from any civil service job in the U.S." when he got done with them.  The Defendant also complained that his mail was read "without a search warrant."  The Defendant then asked Mr. Dee to "get on a computer and find [him] some info" to help him "nail the two detectives."

Exhibit 67 was another letter to Randy Dee dated November 9, 2008.  In the letter, the Defendant called Sgt. Postiglione and Det. Freeman "lying jerks" and stated that he wanted to "take [their] badges so bad [he] [could] taste it."  The Defendant stated that he was "more angry with Postiglione than Freeman" but that Det. Freeman was still "backing the asshole up."  The Defendant then stated that his attorneys were "up against a detective whose been doing this type of bulls--t for [twenty] years."  The Defendant stated that he thought it was "time for [Sgt. Postiglione's] reign of terror to end and harshly."

Exhibit 68 was a letter from the Defendant to his son and grandson from April 2009.  In the letter, the Defendant wanted someone to "at least start something against Postiglione and Freeman legally like, internal affairs, so them assholes can start ducking the s--t."  Exhibit 69 was a letter from the Defendant to Randy Dee dated June 9, 2009.  In the letter, the Defendant complained that "they" did not "make cops pay for their crimes on us poor people."  The Defendant stated that instead "dirty f--king cops [get] to retire and draw [their] monthly money like [they] never did nothing [sic] wrong."

-39-

## V. Verdict and Sentencing

Based upon the foregoing evidence, the jury convicted the Defendant of soliciting Mr. McLaughlin to commit the premeditated first degree murders of Ms. Young, Mr. Kiem, and Mr. Powell. The jury acquitted the Defendant of soliciting Mr. Jenkins to commit the premeditated first degree murders of Sgt. Postiglione and Det. Freeman.

Following a sentencing hearing on February 26, 2010, the trial court sentenced the Defendant as a Range I, standard offender to ten years for each count. The trial court ordered the sentences to be served consecutively, for an effective thirty-year sentence. In determining whether the Defendant's sentences should be served consecutively, the trial court made the following statement:

> Is [the Defendant] under the law a dangerous offender whereby some, all, none of these multiple convictions are run together? Well, the law has discussion of that as well. And the only - - based on the proof, the only possible classification [the Defendant] would possibly fall under is the dangerous offender.
>
> That statute goes on to define that: One whose behavior indicates little or no regard for human life. And [defense counsel is] right in that the case law goes beyond that for courts having to find certain factors. That's what I was mentioning earlier.
>
> Aggregate terms of the sentence and how that relates to the severity of the offense, whether it's necessary within the sentencing of a certain individual to protect the public from further serious criminal conduct. Well, you could say, well, that - - just let that rise and fall on the other charges and if he's convicted then that'll handle that. Well, if he's - - I mean, we [are] here for sentencing on these particular counts. And the Court has to factor in what the law says as to these particular charges and let the other charges rise and fall on their own. He may be found not guilty of all of those particular charges. So I've got to, here today, under those statutory factors and [State v. ]Wilkerson[, 905 S.W.2d 933 (Tenn. 1995),] factors determine what aggregate terms should be imposed based on the facts and circumstances of this case.
>
> And then that gets to what I was discussing. I mean, not every serious offense - - I mean, this is a serious offense based on what I've already said. I mean, going to the - - trying to alter the justice system which some people may not like, but it's the best system I'm aware of in our - - within the world.

So that then gets us [] back to the facts of the case. And when you listen to all of the statements and the discussions on tape, you review the proof that was introduced through some of the letters, I mean, it appears that there's a - - and [the Defendant] argued to the jury, well, he didn't really mean what he was saying, it was mainly Mr. McLaughlin or his idea just to help himself out with the State. But I've looked back through here earlier, the statements on tape and otherwise and without repeating all of them - - I mean, they're fairly descript as to what's being discussed and names, addresses being provided. "We're not going to talk after this as long as they don't show for court, don't care how you carry it out, blah, blah, blah."

I mean it's apparent to the Court that [the Defendant] has a nonchalant attitude about the lives of these three people. Just quite apparent. But as I was saying, not every serious offense makes one a dangerous offender. But in the Court's opinion based on the proof in this particular case and those factors that I've mentioned under the statute and the case law, [the Defendant] would qualify under [Tennessee Code Annotated section] 40-35-115 as a dangerous offender.

After sentencing, the Defendant filed a timely motion for new trial which the trial court denied. A timely notice of appeal was filed, and this appeal followed.

ANALYSIS

*I. Severance*

Prior to trial, the Defendant filed a motion to sever the two counts charging him with solicitation of the first degree murders of Sgt. Postiglione and Det. Freeman from the remaining counts of the indictment. The trial court held a hearing on the matter and issued a written order denying the motion. The trial court concluded that both sets of charges were part of "a continuing plan or conspiracy of preventing key State's witnesses from testifying against" the Defendant in the trial for Ms. Hulbert's murder. The trial court also concluded that if the two groups of offenses were tried separately, evidence of one group would be admissible at trial for the other group as "evidence of the [D]efendant's motive, an absence of mistake on his part, and existence of a larger plan–all of which are material issues in the instant case." The trial court further concluded that "the probative value of such evidence would outweigh any potential prejudice to the [D]efendant."

The Defendant contends that the trial court erred by denying his motion to sever. The Defendant argues that the two counts involving Sgt. Postiglione and Det. Freeman were not

part of a common scheme or plan in relation to the other counts of the indictment because the Defendant had different alleged motives for each group of offenses. The Defendant further argues that, if the two groups of offenses were tried separately, evidence of the counts regarding Sgt. Postiglione and Det. Freeman would not have been admissible at a trial on the remaining counts. The State responds that the alleged solicitations in all five counts were part of a continuing plan "to avoid prosecution in [the Defendant's] capital case." The State also responds that evidence of the two groups of offenses would be admissible in separate trials to show absence of mistake and the existence of a larger plan. The State further responds that the Defendant did not suffer any prejudice by the trial court's ruling because the jury acquitted the Defendant of the solicitation charges regarding Sgt. Postiglione and Det. Freeman.

Tennessee Rule of Criminal Procedure 8(b) provides that "[t]wo or more offenses may be joined in the same indictment" if the offenses are either (1) "parts of a common scheme or plan" or (2) "of the same or similar character." However, Rule 14(b)(1) provides that if "two or more offenses are joined . . . pursuant to Rule 8(b), the defendant has the right to a severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible in the trial of the others." Accordingly, once a defendant makes a motion to sever or objects to a pre-trial consolidation motion by the State, "the trial court must consider the motion by the severance provisions of Rule 14(b)(1)" instead of the provisions of Rule 8(b). State v. Garrett, 331 S.W.3d 392, 402 (Tenn. 2011) (quoting Spicer v. State, 12 S.W.3d 438, 443 (Tenn. 2000)).

Upon a defendant's motion to sever, "the trial court must hold a hearing in order to gather the information necessary to adjudicate the issue." Garrett, 331 S.W.3d at 403. The trial court must sever the offenses unless it can

> conclude from the evidence and arguments presented at the hearing that: (1) the multiple offenses constitute parts of a common scheme or plan; (2) evidence of [one] offense is relevant to some material issue in the trial of all the other offenses; and (3) the probative value of the evidence of other offenses is not outweighed by the prejudicial effect that admission of the evidence would have on the defendant.

Id. (quoting Spicer, 12 S.W.3d at 445) (citations omitted). A trial court's denial of a motion to sever is reviewed under an abuse of discretion standard. Id. at 401 (citing Spicer, 12 S.W.3d at 442).

As our supreme court has previously stated, "a common scheme or plan for severance purposes is the same as a common scheme or plan for evidentiary purposes." State v. Moore,

6 S.W.3d 235, 240 n.7 (Tenn. 1999). For offenses to be considered part of a continuing scheme or plan, the crimes must be directed toward a "common goal or purpose." State v. Denton, 149 S.W.3d 1, 15 (Tenn. 2004) (quoting State v. Hoyt, 928 S.W.2d 935, 943 (Tenn. Crim. App. 1995)) (quotation marks omitted). This "requires proof of 'a working plan, operating towards the future with such force as to make probable the crime for which the defendant is on trial.'" State v. Allen Prentice Blye, No. E2001-01375-CCA-R3-CD, 2002 WL 31487524, at *5 (Tenn. Crim. App. Nov. 1, 2002) (quoting Hoyt, 928 S.W.2d at 943), perm. app. denied (Tenn. Mar. 10, 2003).

We agree with the trial court's assessment that both sets of offenses were part of a common scheme to derail the case against him for Ms. Hulbert's murder. The Defendant argues that his motive in soliciting Sgt. Postiglione and Det. Freeman's murders was his personal hatred for the two men, and that he sought to kill Ms. Young, Mr. Kiem, and Mr. Powell because they would be witnesses against him at his murder trial. However, the evidence established that the Defendant believed that both sets of victims were attempting to "frame" him for Ms. Hulbert's murder. Likewise, the evidence demonstrated that the Defendant was obsessed with and despised all of the victims. Additionally, evidence demonstrating the Defendant's repeated attempts to acquire false alibis illustrated the Defendant's continuing scheme to gain an acquittal in his murder trial by circumventing the judicial process. Therefore, the evidence was sufficient for the trial court to conclude that both sets of offenses constituted parts of a common scheme or plan.

The primary issue of any severance case is whether the evidence of one offense would be admissible in the trial of the other if the two offenses remained severed. Garrett, 331 S.W.3d at 402. Put another way, a severance motion is essentially "'a question of evidentiary relevance.'" Id. (quoting Spicer, 12 S.W.3d at 445). Tennessee Rule of Evidence 404(b) excludes evidence of "other crimes, wrongs, or acts" committed by the defendant when offered only to show the defendant's propensity to commit the crime charged. This is because such evidence lacks relevance and invites the finder of fact to infer guilt from propensity. Garrett, 331 S.W.3d at 402-03. However, evidence of prior bad acts may be admissible for other purposes, such as "to show identity, guilty knowledge, intent, motive, to rebut a defense of mistake or accident, or to establish some other relevant issue." Moore, 6 S.W.3d at 239 n.5 (quoting State v. Hallock, 875 S.W.2d 285, 292 (Tenn. Crim. App. 1993)).

We agree with the trial court's assessment that evidence of one set of offenses would have been admissible at trial for the other set of offenses. The Defendant's main argument at trial was that he did not intend to solicit Mr. McLaughlin or Mr. Jenkins and that the two men misunderstood his statements to them. Evidence that the Defendant offered Mr. McLaughlin $15,000 to kill Ms. Young, Mr. Kiem, and Mr. Powell would have been

-43-

admissible at trial for the solicitation of Mr. Jenkins in order to rebut the defense of mistake or accident. Both Mr. Jenkins and Mr. McLaughlin testified that the Defendant offered them the same amount of money to kill the different sets of victims. Likewise, evidence of the wire recordings with Mr. McLaughlin would have been admissible to corroborate Mr. Jenkins' testimony that the Defendant gave him details about the recorded conversations. Evidence that the Defendant asked Mr. Jenkins to "pull [his] shirt up" in order to demonstrate that he was not wearing a wire would have also been admissible at a trial for the solicitation of Mr. McLaughlin in order to rebut the defense that Mr. McLaughlin took the Defendant's statements out of context. We also agree with the trial court's assessment that the probative value of this evidence would not have been outweighed by the danger of unfair prejudice. Accordingly, we conclude that the trial court did not err by denying the motion to severe.

With respect to the notion that the Defendant was prejudiced by the joinder of the two sets of offenses, we note that prior to trial, the Defendant argued that trying all of the offenses together would improperly "bolster" the State's "weak proof" with respect to the counts regarding Sgt. Postiglione and Det. Freeman. Having been acquitted of those counts, the Defendant now complains on appeal that the counts regarding Sgt. Postiglione and Det. Freeman improperly bolstered the evidence in the remaining counts and created an inference "that the [D]efendant had a propensity to solicit persons to kill others." However, even if the trial court erred by denying the Defendant's motion to sever, such error would ultimately have been harmless. State v. Moore, 6 S.W.3d 235, 242 (Tenn. 1999) (stating that "the defendant must show that the error probably affected the judgment before reversal is appropriate").

Given the overwhelming evidence of guilt with respect to the counts involving Ms. Young, Mr. Kiem, and Mr. Powell, which we will discuss in more detail later in this opinion, and the fact that the Defendant was acquitted on the counts involving Sgt. Postiglione and Det. Freeman, we agree with the State's assertion that the Defendant did not suffer any prejudice as a result of the trial court's denial of his motion to sever and that any possible error by the trial court was ultimately harmless. See Moore, 6 S.W.3d at 242-43 (noting that "the line between harmless and prejudicial error is in direct proportion to the degree . . . by which proof exceeds the standard required to convict" and holding that denial of motion to sever was harmless error where "the evidence presented was more than sufficient for conviction" and because the defendant was acquitted of two of the joined offenses); State v. James Carson Honeycutt, No. E2007-00303-CCA-R3-CD, 2008 WL 2600684, at *15 (Tenn. Crim. App. July 2, 2008) (concluding that "because the jury acquitted the defendant . . . the trial court's error in joining these offenses to those concerning the other two victims was harmless beyond a reasonable doubt"). Accordingly, we conclude that this issue is without merit.

## II. Defendant's Statements to the Police

The Defendant contends that the trial court erred by denying his motion to suppress his statements to the police. The Defendant argues that his statements were inadmissible because he was illegally seized when Sgt. Postiglione "instructed him to exit his truck" because Sgt. Postiglione had no reasonable suspicion to believe that the Defendant had "committed or was about to commit a crime." Alternatively, the Defendant argues that he was illegally seized when Sgt. Postiglione "took possession of his identification." The Defendant also argues that his statements were inadmissible because he was subjected to "custodial interrogation without the benefit of Miranda warnings" while Sgt. Postiglione searched his vehicle. The Defendant further argues that he was subjected to "the functional equivalent of interrogation without Miranda warnings" after his arrest, during a conversation with Sgt. Postilione while the two were inside a car. Finally, the Defendant argues that his statement given after Miranda warnings was tainted and inadmissible due to the prior "extraction of an illegal, unwarned confession from" the Defendant. Alternatively, the Defendant argues that his statement given after Miranda warnings was also considered tainted and inadmissible under the Tennessee Constitution.

The State responds that the trial court did not err in admitting the Defendant's statements to the police. The State responds that Sgt. Postiglione had a reasonable suspicion to stop and seize the Defendant. Alternatively, the State argues that the initial encounter between Sgt. Postiglione and the Defendant was "a consensual police-citizen encounter" which required no reasonable suspicion. The State also argues that the fact that Sgt. Postgilione "retained the [D]efendant's driver's license did not transform the consensual police-citizen encounter into a seizure." The State further responds that the Defendant was not "in custody" while Sgt. Postiglione searched his truck; therefore, Sgt. Postiglione was not required to give Miranda warnings prior to asking the Defendant if he was the person they were looking for and if his truck was the truck they were looking for. The State also responds that Sgt. Postiglione's "small talk" with the Defendant in the car did not amount to the functional equivalent of interrogation. Finally, the State responds that because there was no prior custodial interrogation, the Defendant's statement given after he had received Miranda warnings did not violate his federal or state constitutional rights.

### A. Factual Background

Prior to trial, the Defendant filed a motion to suppress the statements he made to the police when he was arrested for Ms. Hulbert's murder. The arguments in the Defendant's motion mirrored the arguments raised in his appellate brief. On November 9, 2009, the trial court held a hearing on the motion. At the hearing, Sgt. Postiglione and Det. Freeman testified about the Defendant's arrest in more detail than they testified at trial.

At the hearing, Sgt. Postiglione testified that on July 12, 2007, he saw a "similar looking tractor" to one seen on the surveillance video near "the area of the crime scene when the crime had occurred." However, Sgt. Postiglione admitted that he was not able to get any "identifying information" about the truck from the surveillance video besides noticing "some sort of a design on it." Sgt. Postiglione followed the tractor-trailer in a "Ford Taurus, unmarked car" and without activating his emergency lights or sirens. The truck pulled into the TA and parked. Sgt. Postiglione testified that he "saw the curtains on the driver's side of the tractor immediately get pulled closed." Sgt. Postiglione radioed Det. Freeman and informed him that he was "going to approach the driver and just try and speak with him." Sgt. Postiglione testified that he knocked on the door once and got "no response." Sgt. Postiglione believed that approximately thirty seconds passed and then he knocked a second time. At that time, "the curtain came open and [he] saw [the Defendant] looking down." Sgt. Postiglione testified that he showed the Defendant his badge, "asked [the Defendant] if he would mind coming out and speaking to [him]," and "motioned for him to come out."

Sgt. Postiglione testified that the Defendant got out of his truck "fairly quickly." Sgt. Postiglione identified himself and told the Defendant that he was "looking for a truck that might be similar to [the Defendant's] truck." Sgt. Postiglione testified that the Defendant had no shoes on and his shirt was opened. The Defendant told Sgt. Postiglione that he "had woken him up or that he had been asleep." Sgt. Postiglione testified that he "had a casual conversation" with the Defendant and eventually asked the Defendant to consent to provide a DNA sample. The Defendant agreed to provide a DNA sample. Sgt. Postiglione testified that at some point he asked the Defendant for identification and the Defendant gave his driver's license to Sgt. Postiglione. Later, Sgt. Postiglione testified that he "probably had" the Defendant's driver's license after the Defendant was arrested. After "some additional conversation" with the Defendant, Sgt. Postiglione noticed "a few drops of blood on the driver's side door" and on the Defendant's "left thumb." According to Sgt. Postiglione, Det. Freeman arrived shortly after the Defendant got out of the truck.

According to Sgt. Postiglione, after the Defendant provided a DNA sample he asked the Defendant when was "the last time [the Defendant] had been to Nashville." The Defendant told Sgt. Postiglione that it had been May 2007. Sgt. Postiglione then asked the Defendant if he could search the truck. Sgt. Postiglione testified that the Defendant asked him if he "was going to tear the truck up." Sgt. Postiglione assured the Defendant that he would not "tear the truck up," and the Defendant "motioned with his hand to go ahead." Sgt. Postiglione testified that he asked Det. Freeman to get "a consent to search" form from his car. Sgt. Postilione then asked the Defendant if "he had a weapon in the truck and he said he did not." Sgt. Postiglione thought that he "went up into the truck and looked around" when Det. Freeman "got back to the truck." Sgt. Postiglione later testified that he did not get into the truck until after the Defendant had given him "verbal permission" and "signed a

consent to search" form. Sgt. Postiglione testified that prior to entering the Defendant's truck, "there was no level of suspicion whatsoever" on his part, and that everything "was very casual."

Sgt. Postiglione testified that he went back to the "sleeper portion" of the truck and "noticed a large trash bag . . . between the bed and the driver's seat." Inside the bag, Sgt. Postiglione "noticed what appeared to be blood soaked items." The Defendant was "standing outside the truck," and Sgt. Postiglione "asked him about the blood in the bag." The Defendant told Sgt. Postiglione that "he cut his leg getting in and out of the truck." The Defendant was still outside of the truck, and Sgt. Postiglione asked the Defendant to show him the cut. Sgt. Postiglione testified that the Defendant "pulled his pant leg up" and showed Sgt. Postiglione his leg "which did not have a cut, scab, or scar visible." Sgt. Postiglione stated that the blood "appeared to be wet" and that the Defendant "just had no explanation for that." Sgt. Postiglione looked into the bag again and saw "some female clothing." Sgt. Postiglione asked the Defendant "if there was any females who were riding in his vehicle." Sgt. Postiglione testified that the Defendant stated that his wife and daughter "would ride" with him, but the Defendant "was unable" to describe "the clothing that they might [have left] in the truck."

Sgt. Postiglione testified that while he was searching the truck, the "door was open the whole time" and he believed that the "engine was actually running." While Sgt. Postiglione continued to ask the Defendant about the blood found in the bag, the Defendant "jumped into the truck and he stood with his arm . . . on the steering wheel and he was having a conversation with [Sgt. Postiglione] while [he] was seated on the back mattress." The Defendant told Sgt. Postiglione that "the blood actually came from a prostitute in Indianapolis who cut her hand." The Defendant then asked Sgt. Postiglione if he was under arrest, and Sgt. Postiglione told him that he was not. The Defendant also asked if he "needed a lawyer," and Sgt. Postiglione told him that he "couldn't really advise him about that." Sgt. Postiglione testified that he did not give the Defendant Miranda warnings after the Defendant asked him these questions. Sgt. Postiglione testified that he noticed a pair of shoes that had "tread markings" that appeared to be similar to tread markings found at the crime scene in Ms. Hulbert's murder. Sgt. Postiglione showed the shoes to Det. Freeman, asked Det. Freeman if "it looked familiar," and Det. Freeman "agreed that it looked similar." Sgt. Postiglione testified that he did not ask the Defendant any questions about the shoes.

Sgt. Postiglione then asked the Defendant if he was in "the right truck" and if this was the truck he had "been looking for." According to Sgt. Postiglione, the Defendant "twice [] shrugged his shoulders and then he said, 'If you say it is.'" Sgt. Postiglione then asked the Defendant if the Defendant was "the person [they had] been looking for." Sgt. Postiglione testified that the Defendant "did the same thing, shrugged his shoulders and said, 'If you say

so.'" Sgt. Postiglione then asked the Defendant "[f]or a second time whether he had a weapon in the truck and . . . he admitted that he had a .22 [rifle] after initially denying [it]." Sgt. Postiglione told Det. Freeman to "take [the Defendant] into custody" at that point. Sgt. Postiglione admitted that the Defendant was not given his Miranda warnings at the time of his arrest. Sgt. Postilgione testified that he stopped searching the Defendant's truck at that point because he did not want to contaminate the crime scene. Sgt. Postiglione testified that his search of the truck took between ten and twenty minutes.

Sgt. Postiglione testified that as they waited for "a transport car" to take the Defendant to the CJC, the Defendant told him "that he's a diabetic." Sgt. Postiglione recalled that it "was extremely hot that day," in the mid-nineties. Sgt. Postiglione "offered the opportunity [for the Defendant] to sit . . . in [his] car while [they] waited on a patrol car." The Defendant was placed in the front passenger seat of Sgt. Postiglione's car, and Sgt. Postiglione got into the driver's seat. The Defendant was handcuffed while he was in the car. Sgt. Postiglione turned on the air conditioner, and the Defendant "sat there for a few minutes and didn't say anything." Sgt. Postiglione testified that he did not ask the Defendant any questions while they were in the car. Sgt. Postiglione admitted that he "engaged in small talk" with the Defendant, "just typical small talk, [like] 'hot day.'" Sgt. Postiglione testified that he was in the car with the Defendant for approximately ten to twenty minutes.

According to Sgt. Postiglione, the Defendant volunteered that he "was pissed off at Richie and David." Sgt. Postiglione summarized what else the Defendant had told him in the car as follows:

> And then he began to give some information about they did all the killings. He made other statements about he displayed the victim here so we could find her. He said the blood inside the bag belong[ed] to a girl they killed up in Indianapolis. He made some other incriminating statements.

> When he finished I asked him if he'd be willing to make a voluntary statement downtown. He said that he would. And that was it.

Sgt. Postiglione testified that he did not "stop to Mirandize" the Defendant as he was making these statements. Sgt. Postiglione also testified that the Defendant only spoke to him for a "couple of minutes." The Defendant was then placed in the backseat of a patrol car and taken from the TA to a local hospital "to be checked out because he said he had diabetes and . . . said he was feeling hot, possibly sick or something like that."

Sgt. Postiglione testified that he later conducted an interview of the Defendant "down [at] the station." Prior to this interview, the Defendant was advised of his Miranda rights and

signed a written waiver form. Sgt. Postiglione summarized what the Defendant said after receiving his Miranda warnings as follows:

> He spoke about several different homicides that occurred. He claimed not to have been involved but claimed that these other people did it. And he claimed to - - they somehow knew what truck stop he would be at and they would show up at the same truck stop. They would somehow find his weapon; they would kill the victim. In some cases leave the victim in his truck. He then would take the victims out of the truck in some cases. In other cases he would just clean up the blood.

> In our homicide in Nashville, he would - - he took the victim out. He laid her down in a displayed fashion. He said he did that so we could do our job. He wanted the police to find the real killers of all these victims.

Det. Freeman testified at the hearing that he parked his car behind the Defendant's truck to the "left-hand side." Det. Freeman also testified that Sgt. Postiglione's car was parked "parallel" or "beside" the Defendant's trailer, but not behind the trailer. According to Det. Freeman, the Defendant could have backed his truck out of its parking space without having to "run over" the detective's vehicles. Det. Freeman testified that when he approached Sgt. Postiglione and the Defendant, Sgt. Postiglione asked him to get a DNA kit from the trunk of his car. Det. Freeman testified that he read the consent form to the Defendant and told the Defendant that he did not "have to give [them] a sample." The Defendant signed the consent form without saying anything. Det. Freeman testified that he then took the consent form and the samples back to his car. When Det. Freeman came back to the Defendant, Sgt. Postiglione asked him if he had a consent to search form in his trunk. Det. Freeman testified that he explained the form to the Defendant and told the Defendant that he "didn't have to do it." According to Det. Freeman, the Defendant signed the form without saying anything. Det. Freeman recalled that Sgt. Postiglione had not entered the Defendant's truck when he returned with the consent form, but he could not remember if Sgt. Postiglione waited until the consent form was signed to enter the truck.

On November 30, 2009, the trial court entered an order denying the Defendant's motion to suppress. The trial court concluded that the "initial interaction between Sergeant Postiglione and the Defendant" was a seizure because Sgt. Postiglione took the Defendant's driver's license "never to return it." However, the trial court also concluded that Sgt. Postiglione had a reasonable suspicion to seize the Defendant based upon the fact that the Defendant's truck resembled the truck seen on the TA surveillance video and because the truck was "approaching the very truck stop where Ms. Hulbert was found dead." With respect to the questions asked by Sgt. Postiglione during the search of the Defendant's truck,

the trial court concluded that Sgt. Postiglione had "interrogated" the Defendant, but that the Defendant was not "in custody" at the time his vehicle was searched; therefore, the Defendant was not entitled to Miranda warnings. With respect to the Defendant's statements while waiting in the car with Sgt. Postiglione, the trial court accredited Sgt. Postiglione's testimony that he only engaged the Defendant in small talk and concluded that Sgt. Postiglione's decision to sit in the car with the Defendant was reasonable under the circumstances. The trial court concluded that Sgt. Postiglione's actions did not amount to the functional equivalent of interrogation; therefore, the Defendant's statements were admissible despite the fact that he had not been given Miranda warnings. The trial court also concluded that the Defendant's remaining issues were moot because the Defendant had not been subjected to a prior illegal interrogation.

At the April 23, 2010 hearing on the Defendant's motion for new trial, the State presented more testimony regarding who had possession of the Defendant's driver's license on the day of the Defendant's arrest. Sgt. Postiglione testified that he gave the Defendant's driver's license to Det. Freeman within a few minutes of the Defendant giving it to him. Det. Freeman testified that gave the Defendant his driver's license back either before or after the Defendant signed the consent to search form. Det. Freeman recalled that the Defendant put his driver's license back into his pocket or wallet. Sgt. Postiglione testified that prior to interviewing the Defendant at the police station, he retrieved the Defendant's driver's license from the Defendant's wallet, which had been placed on Sgt. Postiglione's desk.

*B. Standard of Review*

On appellate review of suppression issues, the prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." State v. Talley, 307 S.W.3d 723, 729 (Tenn. 2010) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). Questions about "the assessment of witness credibility, the weight and value of evidence, and the resolution of evidentiary conflicts are entrusted to the trial court" as the trier of fact. State v. Meeks, 262 S.W.3d 710, 722 (Tenn. 2008). When the trial court "makes findings of fact in the course of ruling upon a motion to suppress, those findings are binding on appeal unless the evidence in the record preponderates against them." Id. Additionally, a trial court's conclusions of law along with its application of the law to the facts are reviewed de novo without any presumption of correctness. Id.[2]

---

[2]For purposes of brevity, we note that this standard of review applies to this issue and the next two issues addressed: the trial court's denial of the Defendant's motions to suppress his statements to Mr. McLaughlin and his jail letters.

## C. Defendant's Fourth Amendment Claims

Both the federal and state constitutions offer protection from unreasonable searches and seizures with the general rule being "that a warrantless search or seizure is presumed unreasonable and any evidence discovered subject to suppression." Talley, 307 S.W.3d at 729 (citing U.S. Const. amend. IV; Tenn. Const. art. I, § 7). However, these constitutional principles do not limit all contact between the police and private citizens. Instead, "these constitutional protections are implicated only when a police officer's interaction with a citizen impermissibly intrudes upon the privacy or personal security of the citizen." State v. Daniel, 12 S.W.3d 420, 424 (Tenn. 2000). As such, courts have recognized three different types of police-citizen interactions: "1) a full scale arrest which must be supported by probable cause; 2) a brief investigatory stop which must be supported by reasonable suspicion; and 3) a brief police-citizen encounter which requires no objective justification." State v. Nicholson, 188 S.W.3d 649, 656 (Tenn. 2006).

It is only "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968). It has repeatedly been held that "even when police have no basis for suspecting that an individual has committed or is about to commit a crime, the officer may approach an individual in a public place and ask questions without implicating constitutional protections." Daniel, 12 S.W.3d at 425. The United States Supreme Court has explained the reasoning behind this rule as follows:

> [L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions. Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification. The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way. He may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds. If there is no detention–no seizure within the meaning of the Fourth Amendment–then no constitutional rights have been infringed.

Florida v. Royer, 460 U.S. 491, 497-98 (1983) (internal citations omitted).

To that end, "courts have consistently held that the Fourth Amendment is <u>not</u> implicated and no seizure occurs when police approach an individual, in a public place, or in a parked car" and ask the individual questions or request to search, "so long as police do not convey a message that compliance with their request is required." <u>Daniel</u>, 12 S.W.3d at 426. Similarly, this court has previously recognized the validity of the "knock and talk" procedure which is premised on the following:

> Absent express orders from the person in possession against any possible trespass, there is no rule of private or public conduct which makes it illegal per se, or a condemned invasion of the person's right of privacy, for anyone openly and peaceably, at high noon, to walk up the steps and knock on the front door of any man's "castle" with the honest intent of asking questions of the occupant thereof-whether the questioner be a pollster, a salesman, or an officer of the law.

<u>State v. Cothran</u>, 115 S.W.3d 513, 521 (Tenn. Crim. App. 2003) (quoting <u>United States v. Cormier</u>, 220 F.3d 1103, 1109 (9th Cir. 2000)).

Sgt. Postiglione's initial interaction with the Defendant was a consensual police-citizen encounter as described above; therefore, no reasonable suspicion was required from Sgt. Postiglione to approach the Defendant's vehicle and ask to speak to the Defendant. Sgt. Postiglione knocked twice within the span of a minute and, when the Defendant opened the curtain, motioned and asked the Defendant to step out of the truck and speak with him. While Sgt. Postiglione was "visibly armed," he did not draw his weapon, nor did he attempt to physically restrain the Defendant. Sgt. Postiglione did not block the Defendant's truck, and the Defendant could have driven away from the TA parking lot. The Defendant argues that because his truck was running, he would not have been able to hear Sgt. Postiglione's request that he step out of the truck. According to the Defendant, Sgt. Postiglione's "gesture to exit the truck" amounted to an order or demand. However, the trial court accredited Sgt. Postiglione's testimony that he both gestured and asked the Defendant to step out of the truck and speak with him. The evidence in the record does not preponderate against this finding; therefore, we agree with the trial court that Sgt. Postiglione did not demand or order the Defendant out of the vehicle.

The Defendant also argues that "once [he] looked out of his truck from behind the closed curtains and saw Sergeant Postiglione's display of police authority,[3] along with his gesture to exit the truck, no reasonable person in his situation would have felt free to ignore

---

[3]The Defendant argues that Sgt. Postiglione's badge coupled with the fact that Sgt. Postiglione was "visibly armed" constituted a display of police authority.

the police officer's persistent efforts or his instructions." However, the "encounter did not become a seizure simply because [the Defendant] may have felt inherent social pressure to cooperate with [Sgt. Postiglione]." Daniel, 12 S.W.3d at 427; cf. State v. Donaldson, 380 S.W.3d 86, 92-93 (Tenn. 2012) (holding that "a lawful traffic stop authorizes officers, as a matter of course, to require drivers to exit their vehicles"). Accordingly, we conclude that the Defendant was not illegally seized when Sgt. Postiglione's initially approached the Defendant's vehicle and requested that the Defendant step out and speak with him.

However, "what begins as a consensual police-citizen encounter may mature into a seizure of the person." Daniel, 12 S.W.3d at 427. Our supreme court has previously held that "when an officer retains a person's identification for the purpose of running a computer check for outstanding warrants, no reasonable person would believe that he or she could simply terminate the encounter by asking the officer to return the identification." Id. Without identification, a defendant is "effectively immobilized" because "[a]bandoning one's identification is simply not a practical or realistic option for a reasonable person in modern society." Id.

Sgt. Postiglione testified at the suppression hearing that early on in his encounter with the Defendant, he asked for the Defendant's identification and the Defendant gave his driver's license to Sgt. Postiglione. Sgt. Postiglione admitted that he "probably had" the Defendant's driver's license until sometime after the Defendant was arrested. At the motion for new trial hearing, Det. Freeman testified that Sgt. Postiglione gave him the Defendant's driver's license and that he gave the license back to the Defendant around the time the Defendant signed the consent to search form. Under either factual scenario, the detectives retained the Defendant's identification for several minutes. Accordingly, we conclude that the Defendant was effectively seized for Fourth Amendment purposes when Sgt. Postiglione took possession of his driver's license.

We must now determine whether Sgt. Postiglione's seizure of the Defendant was justified by a reasonable suspicion. "An officer conducting an investigatory stop must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." Nicholson, 188 S.W.3d at 659 (quoting Terry, 392 U.S. at 21) (internal quotation marks omitted) (brackets in original). Reasonable suspicion is "a particularized and objective basis for suspecting the subject of a stop of criminal activity, and it is determined by considering the totality of the circumstances surrounding the stop." State v. Binette, 33 S.W.3d 215, 218 (Tenn. 2000) (internal citations omitted).

Based upon the totality of the circumstances, we conclude that Sgt. Postiglione had a reasonable suspicion to detain the Defendant for a brief investigatory stop. Sgt. Postiglione

-53-

testified that the Defendant's truck was similar to a truck seen on surveillance video of the night of Ms. Hulbert's murder and was in the area where Ms. Hulbert's body was found. Sgt. Postiglione also noted that the Defendant's truck had "artistic-type designs" that were similar to markings on the truck from the surveillance video. At trial, Det. Freeman testified that the truck in the surveillance video "went back to [the] back area" where Ms. Hulbert's body was found and was "the only one during the time frame that didn't go get gas or . . . you didn't see a driver walk back to the business or anything else." Additionally, the Defendant lied and told Sgt. Postiglione he had been sleeping when Sgt. Postiglione knocked on his window. Sgt. Postiglione also testified that there was what appeared to be blood on the driver's side door and on the Defendant's left thumb.[4] Accordingly, we conclude that Sgt. Postiglione had a reasonable suspicion to stop the Defendant and that the trial court did not err in denying the Defendant's motion to suppress his statements on Fourth Amendment grounds.

### D. Defendant's *Miranda* Claims

A defendant's statements "made during the course of custodial police interrogation are inadmissible as evidence in a criminal case unless the State establishes that the defendant was advised of certain constitutional rights and waived those rights." State v. Anderson, 937 S.W.2d 851, 853 (Tenn. 1996) (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)). The Miranda decision, by its own terms, "applies to the questioning of an individual who has been taken into custody or otherwise deprived of his freedom by the authorities in any significant way." State v. Dailey, 273 S.W.3d 94, 102 (Tenn. 2009) (quoting Miranda, 384 U.S. at 478) (internal quotation marks omitted). However, a police action that would constitute a Fourth Amendment seizure of an individual does not automatically equate to that individual having been placed "in custody" for purposes of a Miranda analysis. For example, the United States Supreme Court has held that persons temporarily detained pursuant to a traffic stop are not "in custody" for the purposes of Miranda. Berkemer v. McCarty, 468 U.S. 420, 440 (1984). As such, the fact that the Defendant was seized by Sgt. Postiglione when Sgt. Postiglione took possession of his identification does not mean that the Defendant was "in custody" for Miranda purposes.

The test for determining whether a person is in custody to a degree that he would be entitled to Miranda warnings is "whether, under the totality of the circumstances, a reasonable person in the suspect's position would consider himself or herself deprived of freedom of movement to a degree associated with a formal arrest." Anderson, 937 S.W.2d at 855. The determination of whether a suspect is in custody for Miranda purposes is a "very

---

[4]It is unclear from the record exactly when Sgt. Postiglione asked for the Defendant's driver's license and when he noticed what appeared to be blood. However, the stains were on the driver's side door and on the Defendant's thumb.

fact specific inquiry." Id. To that end, our supreme court has supplied the following, non-exclusive, list of factors "relevant to that objective assessment":

> the time and location of the interrogation; the duration and character of the questioning; the officer's tone of voice and general demeanor; the suspect's method of transportation to the place of questioning; the number of police officers present; any limitation on movement or other form of restraint imposed on the suspect during the interrogation; any interactions between the officer and the suspect, including the words spoken by the officer to the suspect, and the suspect's verbal or nonverbal responses; the extent to which the suspect is confronted with the law enforcement officer's suspicions of guilt or evidence of guilt; and finally, the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will.

Id.

The Defendant argues that he was in custody and interrogated when Sgt. Postiglione asked the Defendant if he was in the right truck and if the Defendant was the person he had been looking for. However, based upon our review of the Anderson factors, we agree with the trial court that the Defendant was not in custody for Miranda purposes when Sgt. Postiglione searched his truck. The incident occurred around 10:00 a.m. in a public parking lot, and the Defendant was in the cab of his truck when Sgt. Postiglione asked him the questions. Sgt. Postiglione testified that his search of the truck took between ten and twenty minutes and that his interactions with the Defendant prior to the search also took between ten and twenty minutes. The detectives' total interaction with the Defendant took less than an hour. Sgt. Postiglione described the situation as being one where "[e]verything was casual" and that both his and the Defendant's attitudes were "casual." The detectives did not transport the Defendant away from his truck, and all of their interactions with the Defendant occurred near the truck or inside the truck. Only Sgt. Postiglione and Det. Freeman were present leading up to and during the search.

No restraint or any limitation of movement was placed on the Defendant prior to his arrest. During Sgt. Postiglione's search, the Defendant was free to move around and did so. The Defendant was outside the truck when the search began and climbed into the cab of the truck during the search. The Defendant was at the driver's seat with his arm resting on the steering wheel when Sgt. Postiglione questioned him. Additionally, Det. Freeman testified at the motion for new trial hearing that he had given the Defendant his driver's license back by the time Sgt. Postiglione questioned him. Sgt. Postiglione testified that his interactions with the Defendant began as a "casual" conversation. The Defendant agreed to provide a

DNA sample and gave consent for Sgt. Postiglione to search his truck. Sgt. Postiglione did not overtly confront the Defendant with any suspicions of guilt or evidence of guilt until he asked the Defendant if the truck was the one he had been looking for. Sgt. Postiglione asked the Defendant how the blood had gotten in his truck and why there was women's clothing in his truck. The Defendant told Sgt. Postiglione first that he cut his leg and then that a prostitute had cut her hand in the truck. The Defendant also stated that the clothing belonged to his wife or daughter. Sgt. Postiglione did not ask the Defendant any questions about the shoes he found in the truck, but he instead showed them to Det. Freeman. Det. Freeman merely stated that the tread on the shoes looked familiar. Sgt. Postiglione did not tell the Defendant that he was free to end the search, but Det. Freeman testified that before the Defendant signed the consent to search form he had told the Defendant that he was free to refuse the search. Additionally, when the Defendant asked if he was under arrest, Sgt. Postiglione told him no, and when the Defendant asked if he needed a lawyer, Sgt. Postiglione stated that he could not answer that question.

Despite these facts, the Defendant asserts that the facts of his case present an "even clearer case" of custody than the facts in Dailey, 273 S.W.3d at 94. In Dailey, the defendant was told to come to the police station "on the false pretext that he was going to be fingerprinted [] to assist in the police investigation." Id. at 103. Instead, the defendant was immediately asked to submit to an interview and placed "in a small interrogation room located in a secured portion of the building." Id. The character of the questioning was "accusatory and demanding, aimed at convincing the [d]efendant that the police already had sufficient evidence to convict him of murdering the victim and that he had to give them an explanation." Id. The defendant's "movements were restrained to the extent that he was placed in the back corner of a small room with one door, the door was closed, and a police officer was sitting between the [d]efendant and the closed door." Id. Early in the questioning of the defendant, one of the detectives told the defendant that based upon the evidence he would have to charge the defendant with first degree murder. Id. After having been repeatedly told that the detectives knew he was involved and had sufficient evidence to convict him, the defendant confessed to killing the victim. Id. at 103-04.

The facts of this case are markedly different from the facts presented in Dailey. To summarize, the Defendant was approached by the police in a public place in mid-morning. The conversation between the Defendant and Sgt. Postiglione was described as "casual." The Defendant gave his consent to the search of his truck. No false pretext or deception was used in getting the Defendant to speak with the detectives or agree to the search. The Defendant's movements were never restrained and Sgt. Postiglione's questioning of the Defendant occurred in the cab of the Defendant's tractor-trailer. Sgt. Postiglione did not browbeat or repeatedly confront the Defendant with accusations of the Defendant's guilt. At his most accusatory, Sgt. Postiglione asked the Defendant if the Defendant's truck was

the one he had been looking for and if the Defendant was the person he had been looking for. Based upon a totality of the circumstances, we agree with the trial court that the Defendant was not in custody for <u>Miranda</u> purposes during the search of his truck and Sgt. Postiglione's questioning. Accordingly, we conclude that the trial court did not err in its determination that <u>Miranda</u> warnings were not required prior to Sgt. Postiglione's questioning of the Defendant during the search.

Once Sgt. Postiglione told Det. Freeman to place the Defendant under arrest, the Defendant was in custody for purposes of <u>Miranda</u>. Pursuant to <u>Miranda</u>, warnings must be provided "to an accused when the accused is in custody and is subjected to interrogation or its functional equivalent." <u>State v. Sawyer</u>, 156 S.W.3d 531, 534 (Tenn. 2005) (citing <u>Rhode Island v. Innis</u>, 446 U.S. 291, 298 (1980)). The functional equivalent of interrogation refers "to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect" and includes practices "that the police should know [are] likely to evoke an incriminating response from a suspect." <u>Innis</u>, 446 U.S. at 301. However, "where a defendant makes a statement without being questioned or pressured by a government agent, the statement is admissible, if the statement was freely and voluntarily made by the defendant." <u>State v. Land</u>, 34 S.W.3d 516, 525 (Tenn. Crim. App. 2000); <u>see also</u> <u>Miranda</u>, 384 U.S. at 478 (holding that "[v]olunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today").

The Defendant argues that "Sergeant Postiglione should have known that by placing himself in the car with the [D]efendant" after previously asking the Defendant "several accusatory" questions and "continuing to converse with him, [Sgt. Postiglione's] actions were reasonably likely to elicit an incriminating response from the [D]efendant." The Defendant also argues that there was no "reasonable explanation [] for why [Sgt. Postiglione] would join the [D]efendant in the car for 'small talk.'" However, the testimony at the suppression hearing belies the Defendant's interpretation of the events leading up to his statement to Sgt. Postiglione. As the trial court stated in denying the Defendant's motion to suppress,

> The record reflects that after his arrest, the Defendant expressed concern over his health, given that it was a hot day and he was diabetic. Sergeant Postiglione testified that based on these concerns, he placed the Defendant in the front passenger seat of Sergeant Postiglione's car and turned on the air conditioner. Sergeant Postiglione sat in the driver's seat next to the Defendant; his actions appear reasonable given that it would be unreasonable to leave a recently-arrested suspect, particularly one who had expressed concerns over his health, unattended in [the front seat of] a police car. The

Defendant correctly states that Sergeant Postiglione engaged him in "small talk," but the Court accredits the detective's testimony that the Defendant initiated the discussion regarding the various truck stop killings and that the detective did not ask the Defendant questions about these alleged offenses.

We agree with the trial court's assessment of the facts, and the Defendant has presented no evidence that preponderates against that assessment. Accordingly, we conclude that the Defendant freely and voluntarily made these statements without being questioned or pressured by Sgt. Postiglione. Because Sgt. Postiglione did not subject the Defendant to the functional equivalent of interrogation, he was not required to give the Defendant Miranda warnings prior to the Defendant's voluntary statement. Therefore, the trial court did not err in denying the Defendant's motion to suppress on this issue.

### E. Defendant's Claim that His Post-Miranda Warnings Statement Was Tainted

The Defendant contends that his statement to the police given after the detectives "finally warned [him] of his rights under Miranda" was tainted and inadmissible due to the fact that Sgt. Postiglione had previously subjected the Defendant to a custodial interrogation without the benefit of Miranda warnings. The Defendant argues that Sgt. Postiglione's actions by questioning the Defendant during the search of the Defendant's truck and engaging the Defendant in "small talk" after the Defendant's arrest were an attempt to circumvent the Miranda requirements and a violation of his rights under both the federal and state constitutions. See Missouri v. Seibert, 542 U.S. 600 (2004); Dailey 273 S.W.3d at 104-12. However, we have previously determined that the Defendant was not in custody when Sgt. Postiglione questioned him during the search of the tractor-trailer and that the Defendant was not subjected to the functional equivalent of interrogation when he made voluntary statements to Sgt. Postiglione shortly after his arrest. Therefore, no violation of the Miranda requirements occurred prior to the Defendant's formal interview with the detectives. Accordingly, we conclude that the Defendant's issues under both the federal and state constitutions are without merit with respect to his post-Miranda warnings statement. Therefore, we conclude that the trial court did not err in denying the Defendant's motion to suppress his statements to the police in its entirety.

### III. Defendant's Statements to Mr. McLaughlin

Prior to trial, the Defendant filed a motion to suppress his statements to Mr. McLaughlin arguing that the statements were taken in violation of the Defendant's federal and state constitutional rights against self-incrimination and to counsel. Following a hearing, the trial court ruled that any statements involving Ms. Hulbert's murder and any other murders alleged to have been committed by the Defendant were inadmissible because they

violated the Defendant's Sixth Amendment right to counsel. However, the trial court also ruled that the statements involving the solicitation of Mr. McLaughlin to commit first degree murder were admissible. Redacted versions of the wire recordings were introduced into evidence at trial.

On appeal, the Defendant contends that the trial court erred by denying his motion to suppress his statements to Mr. McLaughlin regarding the solicitation of first degree murder. The Defendant argues that his constitutional right against self-incrimination was violated because he was not informed that Mr. McLaughlin was acting "as an agent of the State" and he was not given Miranda warnings prior to speaking with Mr. McLaughlin. The Defendant acknowledges that conversations between defendants and undercover agents or jailhouse informants do not generally require Miranda warnings, but the Defendant argues that his case is distinguishable because he invoked his right to counsel while being questioned in the Sara Hulbert murder investigation. The Defendant also argues that even if there was no Fifth Amendment violation, the right against self-incrimination in the Tennessee Constitution is "broader and more protective" and was violated by the use of Mr. McLaughlin as a police informant. Additionally, the Defendant acknowledges that the right to counsel is offense specific, but he argues that this court should make an exception to that rule in this case because the facts of Ms. Hulbert's murder and the facts of this case are "so closely intertwined." The State responds that the general rule that Miranda warnings are not required before a defendant speaks to a police informant is not altered by the fact that the Defendant had invoked his right to counsel in another, prior case. The State also responds that the right against self-incrimination in the Tennessee Constitution is generally interpreted to be no broader than the Fifth Amendment and should not be interpreted differently in this case. The State further responds that the right to counsel is offense specific and that there is no exception for cases that are factually "closely intertwined."

### A. *Miranda Warning and Right Against Self-Incrimination*

In Illinois v. Perkins, 496 U.S. 292 (1990), the United States Supreme Court addressed the issue of whether an undercover law-enforcement officer posing as a fellow inmate must administer a Miranda warning to a defendant before questioning the defendant about an offense unrelated to the offense for which the defendant is incarcerated. The Supreme Court concluded that no warnings were needed. The Court explained that the purpose of the Miranda warnings was to "preserve" the Fifth Amendment privilege against self-incrimination "during incommunicado interrogation of individuals in a police-dominated atmosphere." Id. at 296 (quoting Miranda, 384 U.S. at 445) (quotation marks omitted). However, conversations "between suspects and undercover agents do not implicate the concerns underlying Miranda" because the "essential ingredients of a 'police-dominated atmosphere' and compulsion are not present when an incarcerated person speaks freely to

someone whom he believes to be a fellow inmate." Id. Coercion "is determined from the perspective of the suspect," and when "a suspect considers himself in the company of cellmates and not officers, the coercive atmosphere is lacking." Id. (citations omitted). The Supreme Court's decision in Miranda "forbids coercion, not mere strategic deception by taking advantage of a suspect's misplaced trust in one he supposes to be a fellow prisoner." Id. at 297.

The Defendant's trust was "misplaced" in a fellow inmate, Mr. McLaughlin, and the rationale of Perkins would seemingly apply here. However, the Defendant contends that his case is distinguishable from Perkins because, during his interview with police regarding Ms. Hulbert's murder, the Defendant had received his Miranda warnings and requested an attorney. The question of whether a prior request for an attorney alters the Perkins analysis is a question of first impression in Tennessee. However, several other federal and state courts have addressed this issue. These courts have concluded that "if the interaction between the defendant and the informer or undercover agent does not qualify as a 'custodial interrogation' for Miranda purposes, then there is no violation of the defendant's Miranda rights—even if the defendant has previously invoked the Miranda right to counsel." State v. Anderson, 117 P.3d 762, 764-67 (Alaska Ct. App. 2005) (citing cases and holding that the "normal interaction between a jail inmate and a jail visitor is not 'custodial interrogation' for purposes of Miranda—and thus, even if the visitor is working for the police as an informant, this tactic does not violate Miranda"). The reasoning behind this conclusion is that

> there is no support for the concept of a [F]ifth [A]mendment right to counsel which bars conduct not prohibited by Miranda itself. It is the [F]ifth [A]mendment's prohibition against compelled self-incrimination which provides the constitutional underpinning for the prophylactic Miranda rules, including notice of the right to counsel. Absent a police dominated interrogation, the [F]ifth [A]mendment right to counsel does not attach.

Alexander v. Connecticut, 917 F.2d 747, 751 (2nd Cir. 1990) (internal citations omitted). Accordingly, we conclude that the fact that the Defendant had previously requested counsel in a prior case does not alter the Perkins analysis and that Miranda warnings were not required prior to Mr. McLaughlin's conversations with the Defendant.

The Defendant also contends that, even if there was no requirement under the federal constitution that Miranda warnings should have been administered, our state constitution should be interpreted more broadly. Article I, section 9 of the Tennessee Constitution provides that the accused in a criminal case "shall not be compelled to give evidence against himself." Tennessee courts have traditionally interpreted article I, section 9 "to be no broader than the Fifth Amendment." State v. Martin, 950 S.W.2d 20, 23 (Tenn. 1997). The

only "significant difference between these two provisions is that the test of voluntariness for confessions" under article I, section 9 is "broader and more protective of individual rights" than the test under the Fifth Amendment. State v. Crump, 834 S.W.2d 265, 268 (Tenn. 1992). The voluntariness of the Defendant's statements to Mr. McLaughlin is not at issue in this case.

The Defendant urges this court to find that the Tennessee Constitution prohibits "police from using an informant to interrogate a defendant who has invoked his right to counsel during police interrogation." In support of this argument, the Defendant cites several cases from other states. However, the majority of the cases cited by the Defendant were decided prior to the Supreme Court's decision in Perkins. See State v. Fuller, 281 N.W.2d 749 (Neb. 1979); State v. Travis, 360 A.2d 548 (R.I. 1976); Commonwealth v. Hamilton, 285 A.2d 172 (Pa. 1971). The only exception is a Nevada case, Boehm v. State, 944 P.2d 269 (Nev. 1997). However, the Nevada Supreme Court based its decision in Boehm upon a rejection of the principles announced by the United States Supreme Court in Perkins and a finding under the Nevada Constitution that any jailhouse questioning of a defendant by an informant constitutes "custodial interrogation" and requires Miranda warnings. Id. at 271. In contrast, our supreme court has previously applied the Perkins analysis and declined to interpret article I, section 9 of the Tennessee Constitution as providing broader protections than the Fifth Amendment in this regard. See State v. Branam, 855 S.W.2d 563, 568-69 (Tenn. 1993). Accordingly, we conclude that this issue is without merit.

### B. Right to Counsel

The Defendant also argues on appeal that his Sixth Amendment right to counsel was violated because he had previously invoked his right to counsel regarding the Sara Hulbert murder investigation and the facts of Ms. Hulbert's murder and the facts of this case are "so closely intertwined." The Sixth Amendment provides that the accused in a criminal prosecution "shall enjoy" the right to the assistance of counsel. However, the Sixth Amendment right to counsel "is offense specific" and "cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced." McNeil v. Wisconsin, 501 U.S. 171, 175 (1991). The Defendant urges that there should be an exception to this rule when a previously charged offense is "closely intertwined" factually with an uncharged offense. However, the United States Supreme Court has previously held that there is no exception for uncharged offenses that are "factually related" to a charged offense. See Texas v. Cobb, 532 U.S. 162, 168 (2001). Therefore, the trial court did not err when it ruled that any statements regarding Ms. Hulbert's murder were inadmissible but that the statements regarding the solicitation of Mr. McLaughlin were admissible and did not violate the

Defendant's Sixth Amendment right to counsel.[5]  Accordingly, we affirm the trial court's decision to admit the redacted version of the wire recordings at trial.

## IV.  Seizure of Defendant's Jail Letters

The Defendant contends that the trial court erred by denying his motion to suppress several letters he wrote in jail that were subsequently seized by the police.  The Defendant argues that the seizure of his mail violated his Fourth Amendment rights.  The Defendant also argues that the judicial subpoena requiring the Davidson County Sheriff's Department to seize and copy his mail was invalid and that there were "additional illegalities in the service and compliance of the judicial subpoena."  The State responds that the Defendant "had no reasonable expectation of privacy in the letters he sent from jail"; therefore, the warrantless seizure of his letters did not violate the Fourth Amendment.  The State also responds that the Defendant waived his right to challenge the validity of the judicial subpoena used in this case and any irregularities in the service and compliance of the judicial subpoena because the Defendant did not file a motion to quash the subpoena.

As previously stated, both the federal and state constitutions offer protection from unreasonable searches and seizures with the general rule being "that a warrantless search or seizure is presumed unreasonable and any evidence discovered subject to suppression." Talley, 307 S.W.3d at 729 (citing U.S. Const. amend. IV; Tenn. Const. art. I, § 7).  As has often been repeated, "the most basic constitutional rule in this area is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment–subject to only a few specifically established and well delineated exceptions.'" Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)); see also State v. Berrios, 235 S.W.3d 99, 104 (Tenn. 2007).  Such exceptions to the warrant requirement include "searches incident to arrest, plain view, exigent circumstances, and others, such as the consent to search." Talley, 307 S.W.3d at 729.  These constitutional protections "are designed to safeguard the privacy and security of individuals against arbitrary invasions of government officials." Id. (quoting State v. Keith, 978 S.W.2d 861, 865 (Tenn. 1998)) (internal quotation marks omitted).  Therefore, "a trial court necessarily indulges the presumption that a warrantless search or seizure is unreasonable, and the burden is on the State to demonstrate that one of the exceptions to the warrant requirement applied at the time of the search or seizure." State v. Bobby Killion, No. E2008-01350-CCA-R3-CD, 2009 WL 1748959, at *14 (Tenn. Crim. App. June 22, 2009), perm. app. denied, (Tenn. Oct. 26, 2009).

---

[5]The Defendant also contends that the trial court's decision violated his right to counsel under article I, section 9 of the Tennessee Constitution.  However, the Defendant provides no reason, and we can see no reason, that article I, section 9 should be interpreted more broadly than the Sixth Amendment in this regard.

"The interception of a conversation in which a person has a reasonable expectation of privacy constitutes a search within the meaning of the Fourth Amendment." State v. Hill, 333 S.W.3d 106, 125 (Tenn. Crim. App. 2010) (quoting State v. Munn, 56 S.W.3d 486, 494 (Tenn. 2001)). In order to evaluate whether a reasonable expectation of privacy exists, under both our state and federal constitutions, we must determine "(1) whether the individual had an actual, subjective expectation of privacy and (2) whether society is willing to view the individual's subjective expectation of privacy as reasonable and justifiable under the circumstances." Munn, 56 S.W.3d at 494 (citing Smith v. Maryland, 442 U.S. 735, 740 (1979)). "A subjective expectation of privacy that society does not regard as reasonable will not invoke Fourth Amendment protection." State v. Brandon Ray Roland, No. E2002-00927-CCA-R3-CD, 2003 WL 21983024, at *14 (Tenn. Crim. App. Aug. 21, 2003), perm. app. denied, (Tenn. Dec. 22, 2003).

With respect to whether the Defendant had an actual, subjective expectation of privacy in his letters mailed from jail, we note that every inmate received a handbook that stated that inmate mail may be searched and that it may be turned over to law enforcement. Additionally, in an October 8, 2007 phone conversation with his wife, the Defendant stated that he knew his incoming mail was read but he was not sure about his outgoing mail. In a March 2, 2008 letter, the Defendant warned Dee Barrett that "they read what you write" so she should not mention any names when helping him procure a false alibi. The Defendant was given an inmate handbook that clearly stated that his mail could be searched and could be turned over to the police. The Defendant stated on at least two occasions that he was aware incoming mail was "read," and the Defendant acknowledged the possibility that his outgoing mail may have been read as well. The Defendant has failed to demonstrate that he had a subjective expectation of privacy in the letters he sent from his jail cell.

We begin our inquiry into the second element by noting that "a jail shares none of the attributes of privacy of a home, an automobile, an office, or a hotel room. In prison, official surveillance has traditionally been the order of the day." Hill, 333 S.W.3d at 125 (quoting Lanza v. New York, 370 U.S. 139, 143-44 (1962)). Our supreme court has previously noted that "an expectation of privacy is not justified in a jail cell." State v. Williams, 690 S.W.2d 517, 524 (Tenn. 1985). Additionally, this court has stated that "we cannot agree that society would deem reasonable an expectation that calls placed from jail would remain private." Hill, 333 S.W.3d at 126. Furthermore, our supreme court has stated that "the policy of maintaining prison security is a legitimate factor that may bear upon the objective reasonableness of an expectation of privacy." Munn, 56 S.W.3d at 496. With respect to the subject of an inmate's outgoing mail, this court has previously stated that "[t]he scrutiny of an inmate's mail has been upheld so long as the inspection is performed in accordance with established prison procedures in furtherance of the State's interest in the safety and security of its employees and inmates." Roland, 2003 WL 21983024, at *15. The Defendant argues

that he had a reasonable expectation of privacy which was violated because his mail was not searched pursuant to the prison's established procedures nor was it seized for purposes of maintaining prison security.

The testimony at both the hearing on the Defendant's motion to suppress and at trial established that the Defendant's mail was not seized pursuant to the prison's policy but rather seized pursuant to a judicial subpoena. As stated above, our supreme court has stated that prison security is "a legitimate factor" in determining whether an objective expectation of privacy exists. Munn, 56 S.W.3d at 496. As such, DCSD officials could have read, copied, and filed all of the Defendant's mail to determine if he "posed any security problems or threatened the safety of prison employees or other inmates." State v. Taylor, 771 S.W.2d 387, 392 (Tenn. 1989). It seems inconsistent to this court that DCSD officials could have such broad authority to review an inmate's mail as long as they were following internal policy for security review but that they could not comply with a judicial subpoena. We do not believe that the fact that the DCSD deputies did not begin copying the Defendant's mail until after receiving a judicial subpoena somehow created an objective expectation of privacy that would not have existed had the deputies copied the mail pursuant to their own policy.

To that end, we agree with the State that the "primary inquiry is not whether the jail implemented and followed a policy of reading inmates' mail, but rather whether a defendant had a subjective, actual expectation of privacy, and whether society views that expectation as reasonable." As noted above, the Defendant did not have an actual, subjective expectation of privacy in the letters he sent from his jail cell. Additionally, it is this court's opinion that letters sent from jail are analogous to calls placed from jail, and that society would not deem reasonable an expectation that such letters would remain private. Furthermore, we note that the main case cited to support the Defendant's argument, United States v. Savage, 482 F.2d 1371 (9th Cir. 1973), was decided prior to the United States Supreme Court's holding in Hudson v. Palmer, 468 U.S. 517, 526 (1984), that prisoners have no legitimate expectation of privacy in their prison cells. Accordingly, we conclude that the Defendant had no reasonable expectation of privacy in the letters he mailed from his jail cell.

The Defendant also complains that the judicial subpoena used to seize his mail was invalid, that he was not notified of the judicial subpoena, and that the judicial subpoena had an end date of February 1, 2008. As we have previously discussed, the Defendant had no reasonable expectation of privacy in the letters he mailed from his jail cell; therefore, no warrant or judicial subpoena was needed for the DCSD or MNPD to seize his letters. Additionally, in order to challenge a judicial subpoena, a motion to quash must be filed "within seven (7) days of service of the subpoena." Tenn. Code Ann. § 40-17-123(k). Our supreme court has held that a "person has standing to challenge a subpoena issued to a third party, as long as that person asserts a personal right, privilege, or proprietary interest in the

materials being sought by the subpoena." State v. Harrison, 270 S.W.3d 21, 29 (Tenn. 2008). The Defendant complains that he could not have challenged the subpoena because he was never given notice of its issuance. As this court has previously stated, "nothing in Tennessee Code Annotated section 40-17-123 requires that the target of a subpoena issued to a third party be notified about the issuance of the subpoena." State v. Nathaniel P. Carson, No. M2010-02419-CCA-R3-CD, 2012 WL 1484188, at *16 (Tenn. Crim. App. Apr. 27, 2012), perm. app. denied, (Tenn. Oct. 1, 2012). Furthermore, even after the Defendant was informed about the judicial subpoena in May 2008, he did not file a motion to quash the subpoena and filed his "motion to suppress letters" in December 2009. Accordingly, we conclude that the Defendant has waived his issues regarding the validity of the judicial subpoena and its service and compliance because he failed to file a timely motion to quash; therefore, these issues are without merit.

## V. Admissibility of Defendant's Jail Letters and Phone Calls

The Defendant contends that the trial court erred by admitting redacted portions of numerous letters the Defendant had sent from jail and several telephone conversations the Defendant had while in jail. The Defendant argues that the redacted letters were irrelevant and that their probative value was outweighed by the danger of unfair prejudice. For the majority of the redacted letters, the Defendant argues that the letters were irrelevant because they contained "no threats against anyone" and "no plan[s] to kill anyone." The Defendant also argues that the admission of all the letters amounted to cumulative error. In regards to the redacted phone conversations, the Defendant argues that the calls were irrelevant, that their probative value was outweighed by the danger of unfair prejudice, that they were cumulative, and that their admission was a waste of time. The State responds that the letters and phone calls were relevant to establish the Defendant's motive and that their probative value was not outweighed by the danger of unfair prejudice. The State also responds that because there was no error in the admission of the letters and phone calls, there can be no cumulative error.

Tennessee Rule of Evidence 401 provides that relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Generally, relevant evidence is admissible, while irrelevant evidence is inadmissible. Tenn. R. Evid. 402. However, relevant evidence may be excluded if its probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. The exclusion of relevant evidence under Rule 403 is "an extraordinary remedy that should be used sparingly and persons seeking to exclude otherwise admissible and relevant evidence have a significant

burden of persuasion." State v. James, 81 S.W.3d 751, 757-58 (Tenn. 2002) (quoting White v. Vanderbilt Univ., 21 S.W.3d 215, 227 (Tenn. Ct. App. 1999)). "The admissibility of evidence under Rule 403 of the Tennessee Rules of Evidence is a matter within the trial court's discretion and will not be reversed on appeal absent an abuse of that discretion." State v. Biggs, 218 S.W.3d 643, 667 (Tenn. Crim. App. 2006) (citing State v. DuBose, 953 S.W.2d 649, 652 (Tenn.1997)).

We begin by reiterating that relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401 (emphasis added). Despite the Defendant's assertion to the contrary, the mere fact that the phone calls and letters contained "no threats against anyone" and "no plan[s] to kill anyone" would not make them per se irrelevant or inadmissible. As long as the letters and phone calls had any tendency to make a material fact more or less probable, the evidence would be relevant. Additionally, to the extent that the Defendant complains that the admission of his jail phone calls was a waste of time, we note that the Defendant's trial was a long and complicated trial with a significant amount of evidence presented to the jury. The trial court, and not this court, was in the best position to determine whether admission of the jail phone calls amounted to an unnecessary waste of time. On appeal, the Defendant has presented no evidence that the trial court abused its discretion by admitting the jail phone calls over his objection that admission of the phone calls was a waste of time.

As we have previously stated, the Defendant's jail letters and phone calls can be separated into five different categories: (1) calls and letters which referred to Ms. Young, Mr. Kiem, and Mr. Powell and the Defendant's belief that they were responsible for framing him for Ms. Hulbert's murder; (2) calls and letters which referred to Sgt. Postiglione and Det. Freeman, and the Defendant's belief that they were also responsible for framing him for Ms. Hulbert's murder; (3) calls and letters that corroborated Mr. McLaughlin and Mr. Jenkins' testimony; (4) calls and letters in which the Defendant stated that he needed an alibi or attempted to fabricate an alibi; and (5) letters written after June 5, 2008. We will now examine the admissibility of each category of evidence.

*A. Evidence Admissible Pursuant to Rule 403*

With respect to the first category of letters and phone calls regarding Ms. Young, Mr. Kiem, and Mr. Powell,[6] the trial court did not abuse its discretion by admitting them into

[6]This category includes phone calls made on 8/8/07, 8/10/07, 8/18/07, 8/22/07, 8/29/07, 9/17/07, 9/24/07, 9/28/07, 10/15/07, 11/30/07, 5/4/08, 5/6/08, and 5/10/08; letters admitted as Exhibits 18, 29, and 54; and portions of a phone call made on 10/22/07 and letters admitted as Exhibits 16, 21, 23, 24, 28, 36, 37, and 39.

evidence. The evidence at trial established that Ms. Young, Mr. Kiem, and Mr. Powell had no connection to Ms. Hulbert's murder; therefore, motive was a material issue at trial. The phone calls and letters established that the Defendant believed that he was being framed for murder due to a conspiracy involving the three victims. The evidence revealed that the Defendant believed Ms. Young to be the "mastermind" of this plot and that he believed that she was a "threat" to himself and the safety of his family. In addition to being relevant to establish the Defendant's motive, the evidence also was relevant to show the Defendant's intent and absence of mistake. The Defendant argued at trial and on appeal that he did not intend to solicit Mr. McLaughlin but instead simply went along with Mr. McLaughlin's "unsolicited braggadocio." However, these letters and phone calls show that the Defendant was actively seeking personal information about the victims and tracking their whereabouts. This information corroborated Mr. McLaughlin's testimony that the Defendant approached him about killing the victims and provided him with detailed information on the victims. Additionally, the probative value of this evidence was not substantially outweighed by the danger of unfair prejudice. With respect to the repetitive nature of some of the letters and phone calls, we do not believe that this amounted to a needless presentation of cumulative evidence because it showed that the Defendant had a prolonged and obsessive interest in the three victims and that he was not simply following along with Mr. McLaughlin's suggestions.

With respect to the second category of letters and phone calls regarding Sgt. Postiglione and Det. Freeman,[7] the trial court did not abuse its discretion by admitting them into evidence. These letters not only demonstrated that the Defendant had a deep-seated hatred for the detectives, especially Sgt. Postiglione, but also demonstrated that the Defendant believed that the detectives were responsible, or at the very least assisting, in framing him for Ms. Hulbert's murder. As the State asserts in its brief, these letters are relevant to establish the Defendant's motive for soliciting Mr. Jenkins. Additionally, the evidence was corroborative of Mr. Jenkins' testimony that the Defendant talked about Sgt. Postiglione and Det. Freeman excessively, and that is why he knew the identities of the police officers the Defendant wanted him to kill without the Defendant giving him their names. The probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. This evidence likely had some prejudicial effect, but even "when the balance between the evidence's probative value and any prejudicial effect is close, the evidence should be admitted." Goodale v. Langenberg, 243 S.W.3d 575, 587 (Tenn. Ct. App. 2007). With respect to the repetitive nature of some of the phone calls and letters, we again do not believe that this evidence was needlessly cumulative. Instead, this evidence

_____

[7]This category includes phone calls made on 8/20/07, 8/25/07, 8/28/07, and 10/26/07; letters admitted as Exhibits 19, 20, 27, 32, 33, 34, 35, 52, 53, 55, and 57; and portions of letters admitted as Exhibits 16, 17, 21, 24, 28, 31, and 38.

showed the Defendant's increasing anger at the detectives, and the State theorized at trial that the Defendant's growing anger eventually culminated in his request to Mr. Jenkins to kill the detectives. The jury ultimately rejected the State's theory, but that does not alter the fact that the evidence was relevant and admissible at trial.

In addition to his general arguments against the admissibility of this evidence, the Defendant raises two specific instances in which he believes the evidence was irrelevant and extremely prejudicial. In Exhibit 34 the Defendant stated that there was nothing "that a few dead detectives wouldn't cure," and in Exhibit 57 he stated that he had added two more people to his "drop dead" list. With respect to Exhibit 34, the Defendant argues that he was not discussing the case against him for Ms. Hulbert's murder but another murder case. Regardless of which case the Defendant was referring, the statement demonstrates the Defendant's extreme hatred for the police officers investigating him and his belief that "a few dead detectives" would assist him in being acquitted. Accordingly, we deem that this evidence was relevant and highly probative in this case. With respect to Exhibit 57, the Defendant maintains that "drop dead" was a figure of speech and did not demonstrate any suggestion on his part that the detectives actually be killed. Whether the Defendant was being literal about having a list of people he wanted to "drop dead" or was using a figure of speech would go to the weight of the evidence, a jury determination, and not to its admissibility.

With respect to the third category of letters and phone calls which corroborated Mr. McLaughlin and Mr. Jenkins' testimony,[8] the trial court did not abuse its discretion in admitting them into evidence. These letters and phone calls were plainly relevant as they corroborated the testimony of Mr. McLaughlin and Mr. Jenkins. Exhibit 37 showed the Defendant asking one of his daughters to find out about Mr. McLaughlin's criminal history. Other letters and phone calls discussed the Defendant's plan to work for Mr. McLaughlin's uncle after he was released. Phone calls and letters addressing the life insurance policy for the Defendant's wife were also admitted in an attempt to corroborate Mr. Jenkins' testimony. Again, we deem that the probative value of this evidence was high and not substantially outweighed by the danger of unfair prejudice.

In addition to his general objections to this evidence, the Defendant also specifically complained about a phone call from March 25, 2008. In the phone call, the Defendant discussed another inmate who had been convicted for ordering "a hit" based upon "hearsay" and his hope that he would not "get something like that done to [him]." The Defendant contends that this conversation is not evidence of a "consciousness of guilt" because the

---

[8]This category included a phone calls made on 3/25/08, 5/5/08, and 6/1/08; letters admitted as Exhibits 58 and 60; and portions of letters admitted as Exhibits 36, 37, 38, and 39.

phone call was made before he solicited Mr. McLaughlin and that the Defendant was referring to his murder charges and not any future "hits" he was planning. However, whether the Defendant was referring to a planned "hit" or to his murder charges would go to the weight of the evidence and not its admissibility. The Defendant also complains that Exhibit 37 contains references to a dispute with his attorneys and the fact that his past employer went bankrupt, and that these references are unduly prejudicial. However, given the great probative value of this evidence it was not substantially outweighed by any prejudicial effect those references may have had. See Goodale, 243 S.W.3d at 587. Accordingly, we conclude that the trial court did not error in admitting categories one, two, and four of letters and phone calls into evidence.

### B. Evidence Admissible Pursuant to Rule 404(b)

With respect to the fourth category of phone calls and letters involving the Defendant's attempts to obtain a false alibi,[9] this was evidence of a prior bad act and its admissibility was governed by Tennessee Rule of Evidence 404(b). Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that person's actions were in conformity with the character trait. Tenn. R. Evid. 404(b). Generally, Rule 404(b) is one of exclusion, but exceptions to the rule may occur when the evidence of the otherwise inadmissible conduct is offered to prove the motive of the defendant, identity, intent, the absence of mistake or accident, opportunity, or a common scheme or plan. State v. Toliver, 117 S.W.3d 216, 230 (Tenn. 2003); State v. McCary, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003). In addition to these exceptions, evidence of other acts may be admitted to provide the jury with necessary contextual background. State v. Gilliland, 22 S.W.3d 266, 272 (Tenn. 2000); see also NEIL P. COHEN ET AL., TENNESSEE LAW OF EVIDENCE § 4.04[13] (6th ed. 2011) (evidence admissible to tell the "complete story"). We review a trial court's ruling on evidentiary matters under Rule 404(b) for abuse of discretion, provided the trial court has substantially complied with the procedural prerequisites of the rule. State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997).

Here the trial court substantially complied with the procedural prerequisites of Rule 404(b). The evidence of the Defendant's repeated attempts to obtain a false alibi were probative to establish motive, intent, and absence of mistake. The State theorized that the Defendant's inability to find a false alibi provided him with motive to kill the victims and demonstrated his intent to circumvent the judicial process by any means available to him. This evidence also demonstrated that the Defendant was actively searching for someone to provide him with a false alibi and corroborated Mr. McLaughlin's testimony that the

---

[9]This category includes phone calls made on 8/27/07, 10/8/07, 10/12/07; letters admitted as Exhibits 25 and 26; and portions from a phone call made on 10/22/07.

Defendant asked Mr. McLaughlin to obtain a false alibi for him. Mr. McLaughlin testified that his discussions with the Defendant began by his offering to procure an alibi for the Defendant. Mr. McLaughlin discussed his attempts to obtain the Defendant an alibi in each of the wire recordings. Because this evidence corroborated Mr. McLaughlin's testimony, it was highly probative and not outweighed by the danger of unfair prejudice. Accordingly, we conclude that the trial court did not err in admitting this evidence.

### C. Evidence Inadmissible Pursuant to Rule 403

The last category of evidence involved letters sent after June 5, 2008, the date that Mr. Jenkins was released from prison.[10] These letters referred to Mr. McLaughlin and Mr. Jenkins as being "snitches," the Defendant's opinion regarding Mr. McLaughlin and Mr. Jenkins, and more statements regarding the Defendant's opinion of Sgt. Postiglione and Det. Freeman. The State argues that these letters were relevant to establish the Defendant's motive. However, these statements were written after Mr. Jenkins was released from jail and had no further contact with the Defendant. Because these letters were written after the alleged solicitation of Mr. Jenkins we conclude that they were irrelevant and, to the extent that they referred to the detectives, unnecessarily cumulative. Our conclusion that the trial court abused its discretion in admitting these letters does not end our analysis.

Evidentiary rulings ordinarily do not "rise to the level of a constitutional violation" and are subject to non-constitutional harmless error analysis. State v. Powers, 101 S.W.3d 383, 397 (Tenn. 2003). When the error is non-constitutional, "Tennessee law places the burden on the defendant who is seeking to invalidate his or her conviction to demonstrate that the error 'more probably than not affected the judgment or would result in prejudice to the judicial process.'" State v. Rodriguez, 254 S.W.3d 361, 372 (Tenn. 2008) (quoting Tenn. R. App. P. 36(b)). This court is required to consider the whole record and the "greater the amount of evidence of guilt, the heavier the burden on the defendant to demonstrate that a non-constitutional error involving a substantial right more probably than not affected the outcome of the trial." Id.

Here, the letters referring to Sgt. Postiglione, Det. Freeman, and Mr. Jenkins clearly did not affect the outcome of the trial because the Defendant was acquitted of soliciting Mr. Jenkins to kill the detectives. With respect to the Defendant's statements regarding Mr. McLaughlin, these statements merely called into question Mr. McLaughlin's credibility and expressed that the Defendant felt betrayed by Mr. McLaughlin. We do not believe that these statements "more probably than not affected the outcome of trial." Additionally, to the extent that the Defendant argues that these statements somehow affected the outcome of his trial

---

[10]This category included letters admitted as Exhibits 59, 61, 62, 63, 64, 65, 66, 67, 68, and 69.

for soliciting Mr. McLaughlin to kill Ms. Young, Mr. Kiem, and Mr. Powell, we note that the substantial and overwhelming evidence of the Defendant's guilt, which we will discuss in more detail below, would ultimately render this error harmless. Accordingly, we conclude that while the trial court erred in admitting the last category of letters, this error was harmless.

## VI. Contextual Background Evidence

Prior to trial, the Defendant filed a motion to exclude his statement to the police regarding Ms. Hulbert's murder or in the alternative to redact significant portions of the statement. In the motion, the Defendant acknowledged that "certain limited information surrounding [his] arrest . . . and his statements to police were relevant to the trial of this case and admissible as 'contextual background information.'" However, the Defendant argued that details regarding Ms. Hulbert's murder, such as how the Defendant claimed he found her body and how he removed her body from his truck, were "extremely prejudicial" and "not relevant to this trial." The Defendant requested that the information provided to the jury regarding Ms. Hulbert's murder be limited to the following: (1) that the Defendant was arrested and charged with Ms. Hulbert's murder; and (2) that while being interviewed by the police, the Defendant claimed that "Ms. Hulbert was murdered by David Powell and Richie Kiem – two men [the Defendant] knows from Southern Illinois whom he occasionally sees at truck stops while he is on the road working as a long-haul truck driver." In the alternative, the Defendant requested that the trial court redact from the statement details about Ms. Hulbert's murder and all references to other murders the Defendant may have committed.

The trial court issued an order redacting all statements regarding other murders the Defendant may have committed. However, the trial court denied the Defendant's motion to exclude the entire statement and declined to redact statements regarding Ms. Hulbert's murder. The trial court stated the following reasoning:

> The Court finds the defendant is implying or stating within these statements that the two witnesses committed the murder which calls their credibility into question, therefore the defendant's version of events as to the murder is relevant for the jury to assess the defendant's credibility versus these witnesses. The details of Sara Hulbert's death allow the jury to evaluate all relationships between the defendant and the witnesses and the defendant's motive for trying to rid them of being present.

Prior to the Defendant's statement being played for the jury, the trial court instructed the jury that it could only consider the Defendant's statement "for the limited purpose of determining whether . . . it provides a complete story of this alleged crime that he's on trial for." The trial

-71-

court also instructed the jury that it could consider the Defendant's statement to the extent that it established the Defendant's "motive" and "intent" for the solicitation offenses.

On appeal, the Defendant contends that his statement to police as well as Sgt. Postiglione and Det. Freeman's testimony regarding Ms. Hulbert's murder were "extensive and very prejudicial" and "far exceeded what was needed" to provide contextual background. The Defendant chiefly complains that the trial court admitted evidence regarding how the Defendant "disposed of [Ms. Hulbert's] body and the condition of the body when he disposed of it." The State responds that the admitted evidence was not "extensive and very prejudicial." The State further responds that the evidence was not solely admitted on the grounds of providing contextual background to the jury, and that it was also admitted to show the Defendant's motive for soliciting the murders of Ms. Young, Mr. Kiem, Mr. Powell, Sgt. Postiglione, and Det. Freeman.

As previously stated above, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that person's actions were in conformity with the character trait. Tenn. R. Evid. 404(b). Generally, Rule 404(b) is one of exclusion, but an exception to the rule may occur when evidence of other acts is offered to provide the jury with necessary contextual background. Gilliland, 22 S.W.3d at 272; see also COHEN ET AL., supra, § 4.04[13] (6th ed. 2011) (evidence admissible to tell the "complete story"). We review a trial court's ruling on evidentiary matters under Rule 404(b) for abuse of discretion, provided the trial court has substantially complied with the procedural prerequisites of the rule. DuBose, 953 S.W.2d at 652.

Recognizing that events "do not occur in a vacuum, and in many cases, knowledge of the events surrounding the commission of the crime may be necessary for the jury to 'realistically evaluate the evidence,'" our supreme court created a three-part test for determining when evidence of other bad acts may be offered as contextual background evidence under Rule 404(b). Gilliland, 22 S.W.3d at 272 (citing Albrecht v. State, 486 S.W.2d 97, 100 (Tex. Crim. App. 1972)). Our supreme court stated the three-part test as follows:

> [W]hen the state seeks to offer evidence of other crimes, wrongs, or acts that is relevant only to provide a contextual background for the case, the state must establish, and the trial court must find, that (1) the absence of the evidence would create a chronological or conceptual void in the state's presentation of its case; (2) the void created by the absence of the evidence would likely result in significant jury confusion as to the material issues or evidence in the case;

and (3) the probative value of the evidence is not outweighed by the danger of unfair prejudice.

Id. at 272 (emphasis added).

The Defendant complains that the evidence regarding Ms. Hulbert's murder fails to satisfy the Gilliland test. As the State correctly notes in its brief, the Gilliland test is applicable only when the State seeks to introduce the evidence for the sole purpose of establishing contextual background. See State v. Leach, 148 S.W.3d 42, 58 (Tenn. 2004). Here, the trial court ruled that the evidence was admissible to establish motive as well as to provide contextual background to the jury. The trial court instructed the jury that the evidence could be considered for purposes of providing contextual background as well as proving motive and intent. As our supreme court has noted, "[e]vidence proving motive necessarily serves the purpose of completing the story of the crime." Id. When evidence is "offered and properly admitted to show motive," and motive is a material issue in the case, then a jury instruction on contextual background evidence is "superfluous." Id. The Defendant's complaint that the evidence does not satisfy the Gilliand test is misplaced, and the proper inquiry is whether the evidence was admissible to establish the Defendant's motive in this case.

Simply put, motive "is the reason why someone did a particular act" and "may provide the driving force that led the accused to commit the crime being tried." COHEN ET AL., supra, § 4.04[9]. The motive of a defendant in the commission or attempt of a murder is "almost always [a] critical issue[]." State v. Gentry, 881 S.W.2d 1, 7 (Tenn. Crim. App. 1993). Evidence regarding the Defendant's motive was especially relevant with respect to his solicitation of Mr. McLaughlin to kill Ms. Young, Mr. Kiem, and Mr. Powell. According to the detectives, the three victims had no connection to Ms. Hulbert's murder. Absent the evidence regarding Ms. Hulbert's murder and the Defendant's statement to police, the Defendant's actions and his obsession with the victims would have appeared to have been random and would have likely caused significant jury confusion. Furthermore, the statement that the Defendant proposed to be given to the jury made no mention of Ms. Young and mischaracterized how the Defendant knew Mr. Kiem and Mr. Powell. As was evident from the evidence introduced at trial, the Defendant viewed Ms. Young as the "mastermind" of the alleged plot to frame him for murder. The Defendant also told the detectives during his statement that he knew Mr. Kiem and Mr. Powell through Mr. Kiem's mother, Ms. Young.

Additionally, evidence regarding how the Defendant claimed to have found Ms. Hulbert's body and how he claimed to have "displayed" the body was admissible to establish the Defendant's motive for soliciting Mr. Jenkins to kill Sgt. Postiglione and Det. Freeman. The Defendant claimed to have left Ms. Hulbert's body in the TA parking lot "so somebody

would find her and solve the case." However, the Defendant was ultimately arrested for Ms. Hulbert's murder. The evidence at trial established that the Defendant believed that he was also being framed by Sgt. Postiglione and Det. Freeman because he would be easy to convict. In the Defendant's view, he had attempted to help the detectives, but they had instead "planted" evidence against him and ignored his statements about Ms. Young, Mr. Kiem, and Mr. Powell. The evidence regarding what the Defendant told the detectives about where Ms. Hulbert's body had been in his truck and where he had displayed her body was relevant to establish why the Defendant felt he needed to "game the system" by acquiring false alibis and, according to the State, soliciting Mr. McLaughlin and Mr. Jenkins to kill several witnesses. Accordingly, we conclude that the trial court did not err in admitting the redacted version of the Defendant's statement to police and Sgt. Postiglione and Det. Freeman's testimony regarding Ms. Hulbert's murder in order to establish the Defendant's motive for the solicitations, and by extension, to provide contextual background to the jury.

## VII.  Sufficiency of the Evidence

The Defendant contends that the evidence was insufficient to sustain his convictions. The Defendant argues that the evidence failed "to establish beyond a reasonable doubt that he intentionally commanded, requested, or hired [Mr.] McLaughlin to commit first degree murder against [Ms.] Young, [Mr.] Kiem, or [Mr.] Powell." Instead, the Defendant argues, the evidence showed "unsolicited braggadocio by [Mr.] McLaughlin, to which the [D]efendant benignly respond[ed]." The State responds that the evidence was sufficient to sustain the Defendant's convictions. The State argues that it was clear from Mr. McLaughlin's testimony and the wire recordings that the Defendant hired Mr. McLaughlin to kill Ms. Young, Mr. Kiem, and Mr. Powell. The State further argues that the wire recordings show that the Defendant and Mr. McLaughlin "had an understanding from previous conversations that the [D]efendant wanted Mr. McLaughlin to murder the three witnesses."

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the

defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

Tennessee Code Annotated section 39-12-102(a) provides that whoever, "by means of oral, written or electronic communication, directly or through another, intentionally commands, requests or hires another to commit a criminal offense . . . with the intent that the criminal offense be committed, is guilty of the offense of solicitation." The Sentencing Commission Comments to section 39-12-102 state that "the defendant must intentionally try to enlist another in criminal activity and must intend that the offense be committed . . . however, the solicitation need not succeed." First degree murder is defined as a "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). "Premeditation" means that an act is "done after the exercise of reflection and judgment" and that "the intent to kill must have been formed prior to the act itself." Tenn. Code Ann. § 39-13-202(d). A person acts intentionally when "it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a).

The Defendant's arguments on appeal ignore the fact that Mr. McLaughlin testified that the Defendant hired him to kill Ms. Young, Mr. Kiem, and Mr. Powell. Mr. McLaughlin testified that the Defendant asked him "what it would take to get rid of" the victims and that he and the Defendant discussed the best way to kill the victims. Mr. McLaughlin further testified that he and the Defendant discussed whether it would be best to kill Ms. Young like Ms. Hulbert had been killed or to plant a bomb in her trailer or vehicle. Mr. McLaughlin recalled that he had several conversations with the Defendant about killing the victims before he contacted the police. In those conversations the Defendant provided Mr. McLaughlin with the victims' names, addresses, descriptions, and other personal information. Also during those conversations the two men discussed how to make sure there would be no connections between the two of them. Mr. McLaughlin testified that the Defendant sent him a letter offering to give him a truck in exchange for killing the victims. Mr. McLaughlin further testified that he told the Defendant that he would kill the victims in exchange for $15,000, which the Defendant would work off at his uncle's trucking company. While the Defendant may take issue with Mr. McLaughlin's credibility, any questions regarding his credibility were for the jury to decide and not this court. The jury accredited Mr. McLaughlin's testimony, and we will not disturb that decision on appeal.

Additionally, in Exhibit 38, the Defendant recounted a conversation he had with Mr. McLaughlin prior to the wire recordings. According to the Defendant, Mr. McLaughlin had offered to help him procure an alibi and wanted to know "where did [he] need it." The

Defendant stated that he told Mr. McLaughlin "let me count the ways" and "was looking up at the sky." The Defendant further stated that Mr. McLaughlin thought he was not being serious and laughed at him. When Mr. McLaughlin told the Defendant that he was "serious" about helping him, the Defendant responded, "so am I." During both of the wire recordings, Mr. McLaughlin and the Defendant discussed obtaining false alibis for the Defendant. At trial and on appeal, the Defendant has maintained that the wire recordings demonstrated that he simply followed along with Mr. McLaughlin's "unsolicited braggadocio." However, Exhibit 38 shows that the Defendant was "serious" about using Mr. McLaughlin to obtain a false alibi, that the Defendant had previously told Mr. McLaughlin that he was "serious" about the matter, and that the Defendant was not simply following along with Mr. McLaughlin's unsolicited advances.

In addition to Mr. McLaughlin's testimony, it is clear from the wire recordings that the Defendant hired or requested Mr. McLaughlin to kill the victims. In the May 2, 2008 recording, Mr. McLaughlin discussed "helping" the Defendant with Ms. Young and the Defendant stated that he "would owe [Mr. McLaughlin] dramatically." When Mr. McLaughlin told the Defendant that he wanted to know Ms. Young's routine and explained that he needed to know it to help cover up her murder, the Defendant told him that Ms. Young was a "Monday through Friday truck stop whore." The Defendant gave Ms. Young's "CB handle" to Mr. McLaughlin and warned Mr. McLaughlin that if he "hollar[ed] for her it's going to tip her off." The Defendant provided personal information about Ms. Young to Mr. McLaughlin. When Mr. McLaughlin said that he would blow Ms. Young's house up, the Defendant responded "Whatever. You know . . . that's your thing." When Mr. McLaughlin stated that after the Defendant got out they could "settle up," the Defendant asked how they would do that. Mr. McLaughlin told the Defendant that he could work off the debt at his uncle's trucking company, and the Defendant responded "alright." Mr. McLaughlin told the Defendant to keep their conversation between themselves, and the Defendant responded, "[i]t stays."

In the May 16, 2008 recording, Mr. McLaughlin asked the Defendant if the victims were "that big of threat," and the Defendant responded, "[y]eah, it's possible." When the Mr. McLaughlin asked if they were "still on" for the Defendant to pay him back after his release, the Defendant responded, "[y]ep." Mr. McLaughlin then told the Defendant that he would not visit him in jail to tell him that the murders had been committed and jokingly said that he would "send [] a big old billboard." The Defendant immediately responded to Mr. McLaughlin's statement by saying "[n]o connections." Mr. McLaughlin agreed, and the Defendant then stated that the only thing Mr. McLaughlin should leave him was "the number to [his] uncle's trucking company." The two men then had the following exchange:

[Mr. McLaughlin]: So, so that's good. Ah, now, you know I'm not new to this. So, I'm gonna ask you something that I've had to ask a couple of other people. I ain't gonna do this, then you gonna wind up having remorse, or a guilty conscience or whatever.

[The Defendant]: Like I said, you do your thing (inaudible).

[Mr. McLaughlin]: Alright.

[The Defendant]: (Inaudible) it's not mine.

[Mr. McLaughlin]: Then I'll do it how I do it. Uh, so.

[The Defendant]: And I don't want to know. You know.

[Mr. McLaughlin]: Ah, plausible deniability with you?

[The Defendant]: Sure. The less I know, the better it is for you.

[Mr. McLaughlin]: How is it less . . . come over here, man.

[The Defendant]: 'Cause if they connected us I could say no, no that's bulls--t.

[Mr. McLaughlin]: Well, I, I, I see what you're saying.

Later in their conversation, Mr. McLaughlin asked the Defendant if Ms. Young's daughter was a threat and if she "need[ed] to go." The Defendant told Mr. McLaughlin that Ms. Young's daughter was not and turned down his offer to kill her. When Mr. McLaughlin had trouble remembering the names of the victims or personal details about them, the Defendant would correct him and provide personal information about the victims. When Mr. McLaughlin asked if they had a deal and if they were "straight," the Defendant responded affirmatively to both questions. The Defendant repeatedly reminded Mr. McLaughlin to leave him the phone number to his uncle's trucking company and that the two would not speak after their conversation.

Despite the Defendant's assertions in his appellate brief, the wire recordings reveal that he was actively planning the victims' murders with Mr. McLaughlin. The Defendant provided detailed personal information about the victims and was concerned about how he would "settle up" with Mr. McLaughlin. The Defendant was also concerned about covering up any connection between himself, Mr. McLaughlin, and the murders. The Defendant was extremely concerned that Mr. McLaughlin would forget to leave him the number to Mr. McLaughlin's uncle's trucking company. When asked by Mr. McLaughlin if they had a deal, the Defendant responded affirmatively. The fact that the Defendant turned down Mr. McLaughlin's offer to kill Ms. Young's daughter belies the Defendant's assertion that he was "benignly" responding to Mr. McLaughlin's "unsolicited braggadocio." Additionally, Exhibit 38 established that the Defendant was "serious" about using Mr. McLaughlin to obtain a false alibi and illustrated that the Defendant was not simply following along with Mr. McLaughlin's unsolicited advances. Based upon the overwhelming evidence of Mr. McLaughlin's testimony and the wire recordings, we conclude that the evidence was sufficient to sustain the Defendant's convictions.

## VIII. Consecutive Sentences

The Defendant contends that the trial court erred by imposing consecutive sentences in this case.[11] The Defendant argues that the State failed to establish that consecutive sentences were necessary to protect the public from further criminal acts by the Defendant. The Defendant also argues that, given his age and the fact that he has been incarcerated since his arrest in the Sara Hulbert case, the effective thirty-year sentence was not the least severe measure necessary to achieve the purposes for which the sentence was imposed. The State responds that the trial court did not err because it "made the appropriate findings and considerations that the [D]efendant was a dangerous offender." The State also responds that the Defendant's behavior "indicated little or no regard for human life and that he had no hesitation about committing a crime in which the risk to human life was high"; the public needed to be protected from further criminal acts by the Defendant because he solicited three murders "from inside his jail cell"; and the effective sentence was reasonably related to the severity of the offenses.

An appellate court's review of a consecutive sentencing decision is de novo on the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d). As the Sentencing Commission Comments to this section note, on appeal the burden is on the Defendant to show that the sentence is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, the court may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991); see also State v. Carter, 254 S.W.3d 335 (Tenn. 2008).

When a defendant is convicted of multiple offenses, the trial court must determine whether the sentences will be served consecutively or concurrently. Tenn. Code Ann. § 40-35-115(a). Tennessee Code Annotated section 40-35-115(b) provides seven classifications which, if established by a preponderance of the evidence, the trial court may order consecutive sentences. We agree with the trial court's assessment that the only possible classification which would support consecutive sentencing in this case is that the "defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(4). Our supreme court has held that when a trial court imposes consecutive sentences based upon the "dangerous offender" classification, the trial court must also make, "in addition to the application of general principles of sentencing, the

---

[11]On appeal, the Defendant does not challenge the trial court's decision regarding the length of his sentences.

finding that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences must reasonably relate to the severity of the offenses committed." Wilkerson, 905 S.W.2d at 939.

Here, the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, gave due consideration to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, and gave due consideration to the Wilkerson factors. We agree with the State and the trial court that the Defendant's behavior exhibited little or no regard for human life and that he had no hesitation about committing a crime in which the risk to human life was high. The Defendant requested and hired Mr. McLaughlin to kill three people and agreed to Mr. McLaughlin's proposal to kill the victims by bombing their trailer. The Defendant informed Mr. McLaughlin that Ms. Young and Mr. Kiem lived in a trailer park and that Mr. Kiem had "a baby and a girlfriend." After informing Mr. McLaughlin about this, the Defendant responded "whatever" when Mr. McLaughlin stated that he would "blow the whole f--king house up." Mr. McLaughlin also stated that he would create an explosion so large it could be seen from space. The Defendant was completely indifferent to the risks he and Mr. McLaughlin's plan posed to innocent bystanders, including Mr. Kiem's child and girlfriend. Additionally, Mr. McLaughlin repeatedly asked the Defendant if he had any hesitation or second thoughts about killing the victims, and the Defendant was clear that he had none.

With respect to whether consecutive sentences were necessary to protect the public from further criminal conduct by the Defendant, we agree with the trial court that the Defendant's crimes were an attempt to circumvent the judicial system and avoid a full and fair trial for Ms. Hulbert's murder. At the sentencing hearing, the trial court was concerned that the Defendant's crimes went "to the very heart of the justice system," and if he was not punished appropriately, it could encourage other defendants to think that they could "just get rid of [witnesses] and [their] more serious case will go away." Additionally, the evidence at trial established that the Defendant had an extreme contempt for law enforcement and the judicial system. Given the fact that the Defendant solicited the murder of three people with absolutely no concern shown for the lives of others, including "a baby," and the fact that the Defendant was able to solicit these murders from inside his jail cell, we conclude that the State established by a preponderance of the evidence that consecutive sentences were necessary to protect the public from further criminal conduct by the Defendant.

Finally, concerning whether the Defendant's effective thirty-year sentence was the least severe measure necessary to achieve the purpose for which the sentence is imposed, we again agree with the State and the trial court. The Defendant was sentenced to ten years, the mid-point of the applicable sentencing range, for each conviction. The Defendant was also sentenced as a Range I, standard offender, requiring that only thirty percent of his sentence

be served before he is eligible for release.  The offenses committed by the Defendant were gravely serious, he solicited the premeditated first degree murder of three people.  Additionally, the Defendant was indifferent to the danger that would have been posed to innocent bystanders had this plan been carried out.  The Defendant solicited the murders in an attempt to circumvent the judicial process, and the Defendant was able to commit these offense while in confinement pending his trial in Ms. Hulbert's murder.  Based upon the foregoing, we conclude that the trial court did not err by imposing consecutive sentences on the Defendant for an effective thirty-year sentence.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE